In the Matter of the WELFARE OF C.D., C.T., M.T., and S.T.

No. C2–86–112.

Court of Appeals of Minnesota.

Oct. 7, 1986.
Review Denied Nov. 26, 1986.

---

Dorothy A. Regis, Eagan, for appellant.

Mark J. Ponsolle, Hastings, for respondent.

Thomas W. Pugh, So. St. Paul, for Children.

Heard, considered and decided by LANSING, P.J., and PARKER and NIERENGARTEN, JJ.

## OPINION

LANSING, Judge.

Sarah T. appeals from an order denying her motion for a new trial or, alternatively, for amended findings, and from an order terminating parental rights to her four children. The order also terminated the parental rights of her husband, the father of three of the children. He does not appeal. We affirm.

## FACTS

Sarah T. is the mother of C.D., age 14; C.T., age nine; M.T., age six; and S.T., age two. Her first court proceeding in connection with the children began with a petition filed by Dakota County in November 1980. This occurred after the county removed C.D. from his home and placed him in emergency foster care. The petition alleged that Sarah T. and her husband were neglecting C.D., then age eight; C.T., age three; and four-month-old M.T. S.T. was not yet born. A county social worker recommended an initial reunification plan to the court on December 3, 1980. The plan included psychological evaluation of C.D. and physical evaluation of all three children. On April 22, 1981, another social worker recommended an updated reunification plan which included a comprehensive evaluation and treatment program for Sarah T., individual therapy and eventual family counseling for C.D. and counseling for Sarah T.'s husband, Marcus T.

On June 2, 1981, after a hearing, the trial judge found the children were neglected within the meaning of Minn.Stat. § 260.-015(10)(b) (1984) ("without proper parental care because of the faults and habits of their parents"). As part of the disposition, the court ordered protective supervision with Dakota County over C.T. and M.T. and ordered family therapy, also under direction of the county. The court reviewed this disposition eight times between the initial adjudication and November 1984. Each time, the court found the children continued to be neglected. Also, in each of these reviews the county social services submitted recommendations for reunification plans which involved counseling for Sarah T., counseling and chemical dependency treatment for the children's father, and counseling for the children.

In December 1981 C.D. returned home, and Dakota County received protective supervision over all the children. The court ordered continued therapy.

On June 24, 1982, Sarah T. and her children entered Lewis House Shelter for Battered Women, but they left on the same day. A month later the children's father was charged with fourth-degree assault on Sarah T. for an incident which occurred on July 18, 1982.

On July 22, 1982, a social worker and police officer intervened at the home because Sarah T. attempted suicide. She assaulted both the social worker and police officer. She was placed on a 72-hour hold at Mounds Park Hospital psychiatric unit. The three children were placed in a foster home, where they remain. The court transferred custody of C.D., C.T. and M.T. to the county.

Sarah T. was later hospitalized at the psychiatric unit of the Metropolitan Medical Center from October 24, 1982, through November 19, 1982. Her counselor, Sam Scholl, testified that

> along with Dr. Lakosky, who was the attending psychiatrist * * * we felt that her problems were more of a personality disorder type rather than just depression or anxiety * * * [P]ersonality disorders come pretty much out of a lifestyle where there has been a lot of abuse, there has been a lot of failure, there has been a lot of hardship.

The next incident occurred in August 1983, when Sarah T. verbally abused and assaulted a child protection worker by repeatedly hitting her with a closed fist. After the assault, she was assigned to a new social worker, but made minimal effort to contact him between the time of his appointment and the date of the trial. There were three other incidents of assaultive behavior between the August 1983 incident and the trial court date.

From July 1983 until the end of January 1984, Sarah T. lived at the New Hope Center, a residential home for women with problems. The environment is extremely structured; the director testified that Sarah T. was not violent or verbally abusive there.

In November 1983 Sam Scholl recommended terminating visitation between the parents and children because the visits were upsetting to the children.

On January 27, 1984, S.T. was born. In the hospital Sarah T. received a referral to a public health nurse. The nurse testified that, on her first visit, Sarah T. told her that in the past she had other people's thoughts, but now she had her own thoughts again. The nurse observed S.T. as a normal, healthy, two-week-old baby, with her birth weight in the 50th percentile. On later visits the nurse noticed Sarah T. was under greater stress. Her speech rambled and was difficult to follow, particularly her religious references. The nurse said that, over the course of her visits, Sarah T.'s parenting ability and mental health deteriorated. The nurse became concerned about S.T.'s slow weight gain. At three months of age, S.T.'s weight had dropped to the fifth percentile. By May 1984 the nurse believed that Sarah T. was very preoccupied with the outside stresses in her life and the care of S.T. was only adequate most of the time.

On May 9, 1984, Sarah T. placed S.T. at the Minneapolis Crisis Nursery. While at the nursery, S.T. was taken to Minneapolis Children's Hospital because the child-care staff of the nursery were concerned about her physical condition, which included un-

derweight, a rash covering her chest and back, and ointment caked into her groin area. At the nursery S.T. gained a pound in 48 hours, which the director testified was quite unusual for a three-month-old. In the previous two months she had gained only four ounces. The physician at the hospital prescribed medication to reduce the inflammation and swelling and to treat her seborrhea and diaper rash. Another prescription was provided for a double ear infection. On May 11 Sarah T. took S.T. out of the nursery and home with her.

The public health nurse last visited Sarah T. on May 11, 1984. Sarah T. had moved out of her mother's house and had started to live independently in an apartment. She became increasingly agitated during the nurse's visit. In talking about plans for S.T., including a doctor's appointment for a weight check and general checkup, Sarah T. "very suddenly lunged at [the nurse], began screaming, and was shaking her fist about one inch from [the nurse's] face, screaming at [the nurse] to quit pressuring her, to get out and never come back." On the same day she shouted, "I don't care if [S.T.] lives or dies. You can have her anyway. I know you are trying to take her away from me." The nurse testified that S.T. was at high risk for abuse or neglect. She based this opinion on the behavior Sarah T. had exhibited toward her (the nurse), the suddenness of mood change, her preoccupation with other stresses and S.T.'s consistently poor weight gain.

After S.T.'s birth, Sarah T. moved to Minneapolis and began working with a Hennepin County social worker. In early 1984, during an unscheduled visit at his office, she assaulted the social worker. After Sarah T. removed S.T. from the crisis nursery, the social worker visited her at her apartment. Sarah T. began screaming at him, handed him the infant (S.T.) and told him to take the baby from the home. The social worker took S.T. to Hennepin County Medical Center for a checkup and placed her in shelter care.

On May 24, 1984, Hennepin County filed a petition alleging Sarah T. neglected S.T.

S.T. was placed in foster care with her brother and sister on August 16, 1984. Venue of S.T.'s case was transferred to Dakota County on December 14, 1984, and all reunification efforts were expanded to include S.T.

On September 20, 1982, the children's father received a psychological and chemical dependency evaluation. He was diagnosed as chemically dependent and referred to structured outpatient treatment but did not complete the program. He has failed to complete any program and has not had any contact with Dakota County since summer 1984.

On March 19, 1981, Sarah T. obtained a psychological evaluation at the Dakota County Mental Health Center. During the initial interview she shouted, lunged at the interviewer and struck him on the side of the head. The evaluation recommended intensive treatment for Sarah T. On September 20, 1982, Sarah T. obtained a psychological and chemical dependency evaluation. These tests indicated possible chemical dependency/codependency and passive aggressive personality disorders. On October 24, 1982, Sarah T. was admitted to Metropolitan Medical Center for inpatient psychiatric evaluation. She was discharged on November 19, 1982. The evaluating psychiatrist found that Sarah T. had difficulty dealing with stress, tended to deny problems and had difficulty resolving problems.

Sarah T. started therapy with a licensed psychologist in November 1981. She continued to have difficulty dealing with stress, continued to deny problems and therefore had trouble resolving them.

At the termination hearing the court found that Sarah T. was unable to function when faced with the pressures of providing for her daily needs, of caring for her children and finding appropriate activities and friendships for herself. During times of stress Sarah T. is unreasonable and dangerous to the children. The court found that Sarah T. did not have the present ability to parent C.D., C.T., M.T. and S.T., nor will she have the ability to parent the children in the reasonably foreseeable future. The court specifically found, based on testimony, that the children arrived in foster care in very poor emotional condition. C.D. had temper tantrums and wet his bed; C.T. was extremely immature and wet his bed; M.T. was withdrawn. While in therapy and in the security of the foster home, the children's emotional condition substantially improved.

The trial court expressed concern for the permanency planning for the children and determined it was in the best interest of the children that the parental rights of their father and Sarah T. be terminated. The court found that Sarah T. had been given a number of opportunities to reunify the family and had not availed herself of those opportunities. The court concluded that the chances of reunification of the family in the near future were unlikely and ordered that the parental rights of the father and Sarah T. be terminated.

## ISSUE

Does the evidence sustain the court's order of termination?

## ANALYSIS

In a termination of parental rights, the trial court must make clear and specific findings which conform to the statutory requirements. *In the Matter of the Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980). The evidence supporting the termination must address conditions that exist at the time of the hearing; it must further appear that the conditions will continue for a prolonged, indeterminate period. *Id.* Finally, the appellate court will give deference to the findings of the trial court, but will exercise great caution in a termination proceeding. *Id.* (citations omitted).

The court based the termination of the parental rights of Sarah T. on Minn.Stat. § 260.221(b):

(1) That the child is neglected and in foster care;

(2) That the parent has substantially, continuously, or repeatedly refused or

neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able;

(4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child.

The trial court's findings were specific and extensive. They support the conclusions that the children were neglected and in foster care and that the parents had neglected to comply with the duties imposed by the parent and child relationship. They also support the court's determination that the children's father and Sarah T. are unfit to parent the children because of their consistent pattern of violence, instability and inconsistency, which is detrimental to the children's physical and mental health.

Sarah T. argues that the county did not provide adequate services to help reunite the family, that the evidence did not show the children were being neglected at the time of the hearing or that the neglect will continue for a prolonged period, and that additional services would be likely to bring about lasting parental adjustment which would enable a return of the children within an ascertainable period of time.

There is some evidentiary support for Sarah T.'s contentions. However, the record provides clear and convincing evidence that Sarah T. had received a reasonable opportunity to review, become involved in and cooperate with reunification plans developed by Dakota County social services and presented to the court during the various reviews, but that neither the children's father nor Sarah T. showed more than a minimal interest in the welfare, care or development of the children between 1980 and 1985. There is also support for the court's conclusion that Dakota County provided appropriate social services and maximum efforts to rehabilitate the family in order to reunite the children with their parents. And finally, the record supports the court's finding that Sarah T. made only minimal effort to maintain contact with Dakota County. All of this supports the court's final conclusion that reunification of the family could not occur within the reasonably near future.

By the time of trial C.D. had been in foster care for four years, C.T. and M.T. for more than three years and S.T. for approximately 15 months of her two-year life. Although Sarah T. has been faithful in attending her personal counseling sessions and has made minimal efforts on the children's behalf, we cannot say that this is enough. As the supreme court said in *In the Matter of the Welfare of J.J.B., a Minor Child,* 390 N.W.2d 274 (Minn.1986):

The trauma initially attendant upon the separation of the child from his family is sometimes followed by the physical and emotional harms associated with prolonged out-of-home care. Foster care, originally intended as a system of temporary care for children who would ultimately return to their natural families, has, in many instances, become a system of long-term care characterized by considerable instability for the children. Children in foster care for long periods are from time to time placed in different homes and with different caretakers; statistically, they rarely return to their familial homes. Accordingly, long-term placement is often inconsistent with the public policy embodied in Minn.Stat. § 256F.01 (Supp.1985), the right of all children to live in families that offer a safe, permanent relationship with nurturing parents or caretakers and have the opportunity to establish lifetime relationships.

We therefore conclude that where, as here, the record demonstrates a long-

term placement characterized by a repeated failure of reasonable efforts to reunite the family, the trial court should appropriately determine what action most readily promotes the best interests of the child. While judicial caution in severing the family bonds is imperative, untoward delay of the demonstrated inevitable is intolerable.

*Id.* at 279–80 (footnotes and citations omitted).

Our decision is not an indictment of Sarah T. As the court said in *In the Matter of the Welfare of R.M.M,* 316 N.W.2d 538, 542 (Minn.1982), it is rather "a recognition that this woman, who has herself been victimized in so many ways and for so long, is simply unable to care for her child[ren] even though she loves [them]." The trial court appropriately found that Sarah T.'s inability to properly care for the children threatens their mental and physical health. We must affirm the decision of the court below to terminate her parental rights.

### DECISION

Affirmed.