**In the Matter of the
WELFARE OF M.D.O.**

No. C3–89–1218.

Supreme Court of Minnesota.

Nov. 2, 1990.

Rehearing Denied Nov. 28, 1990.

William R. Kennedy, Hennepin County Public Defender, Barbara Isaacman, Asst. Hennepin County Public Defender, Minneapolis, for appellant.

Thomas L. Johnson, Hennepin County Atty., Christine R. Curtiss, Asst. County Atty., Minneapolis, for respondent.

John Fitzgerald, Kuduk, Shoaps & Day, Minneapolis, for guardian ad litem.

## OPINION

POPOVICH, Chief Justice.

After Janet Ostlund was convicted of the second-degree murder of her adopted daughter, Maria, the Hennepin County Bureau of Social Services petitioned to terminate parental rights between Janet Ostlund and M.D.O., Ostlund's biological child born after the death of the adopted daughter. The trial court dismissed the petition, concluding the county had failed to establish by clear and convincing evidence that Ostlund was palpably unfit to be a party to the parent-child relationship or that Ostlund had refused or neglected to comply with the duties imposed by that relationship. The court of appeals panel reversed, finding Janet Ostlund palpably unfit to be a party to the parent and child relationship because of "a consistent pattern of abuse" of her adopted daughter and Janet Ostlund's refusal to make a rehabilitative admission of her culpability for that death. *In re Welfare of M.D.O.*, 450 N.W.2d 655, 658 (Minn.App.1990), *rev. granted* (Minn. Mar. 22, 1990). We reverse.

I.

David and Janet Ostlund were married in January of 1983. After experiencing fertil-

ity problems, the Ostlunds adopted Maria, a 15–month–old child from El Salvador. When Maria arrived in the United States in early September of 1985, she suffered from a host of medical problems. She was underweight and malnourished. She had infected ears, mild anemia, a small head size, a heart murmur and scabies. Doctors diagnosed Maria as developmentally delayed and possibly mentally retarded. Due to these medical conditions, Janet Ostlund took Maria to Dr. Mace Goldfarb, a pediatrician, who attended Maria's medical needs.

Dr. Goldfarb noticed unexplained fluctuations in Maria's weight and asked Ostlund to monitor Maria's food intake. Maria's weight decreased after arriving in the United States, but increased when she was cared for by her godmother while Ostlund was hospitalized in October of 1985. Maria's weight then decreased again, but did not decrease after January of 1986. In late October of 1985, Janet Ostlund brought Maria to Dr. Goldfarb because Maria was having difficulty crawling and raising herself up. Dr. Goldfarb discovered that one of Maria's arms had a slight fracture. Janet Ostlund thought the fracture was caused by some furniture falling on Maria or by rough treatment by one of the other children in the home. The exact cause of the fracture, however, was never determined. Although he noticed improvement over the course of visits, Dr. Goldfarb became concerned about Maria's failure to thrive and Ostlund's attachment with Maria. Eventually, Dr. Goldfarb's concern prompted him to contact the county in June of 1986 regarding possible abuse or neglect.

On the evening of July 14, 1986, Janet Ostlund took Maria to North Memorial Hospital. When she arrived, Maria was comatose and not moving. Doctors diagnosed Maria as suffering from a severe brain injury and transferred her to Minneapolis Children's Hospital. Maria died the following day from closed head trauma due to swelling of the brain and subdural bleeding. Ostlund said the child fell while climbing on the living room couch and hit her head on the floor. The county social workers, who had been in contact with Janet Ostlund before Maria's death, felt Ostlund's explanation was not consistent with the cause of death. Believing Ostlund caused Maria's injuries by shaking the child, the state charged Ostlund with unintentional second-degree murder. On September 11, 1986, two months after Maria's death, Janet Ostlund gave birth to M.D.O., the subject of this matter and the only natural offspring of Janet and David Ostlund.

At the criminal trial, the state introduced evidence Ostlund abused and mistreated Maria and other children in Ostlund's unlicensed day care home to cast doubt on Ostlund's explanation of Maria's injuries. This evidence included the testimony of family and friends describing various occurrences between Ostlund and Maria. Ostlund was said to have once fed Maria a hot potato, and at a different time she tossed a foam ball into Maria's face several times. Witnesses testified about Ostlund spanking Maria for playing with her food, slapping her face, and carrying her by one arm. Other incidents described Ostlund as being reluctant to hold or show affection toward Maria unless others were around. One witness testified to having seen Maria drooling blood and on another time seeing the child with a black eye. Ostlund's husband, however, never saw a black eye. Lynn and Anna Ostlund, Ostlund's stepchildren, testified Ostlund would drop children into their cribs and would not feed the younger day care children who could not talk. They also said Ostlund would shake Maria, not hard, when the child misbehaved.

The jury convicted Ostlund of the unintentional second-degree murder of Maria Ostlund in January of 1987, and the trial court sentenced Ostlund to 105 months at the Minnesota Correctional Facility at Shakopee, Minnesota. Ostlund appealed her conviction to the court of appeals, raising several issues including whether the trial court erred in admitting evidence of Ostlund's past treatment of Maria and other children. *See State v. Ostlund*, 416 N.W.2d 755, 757–58 (Minn.App.1987), *pet. for rev. denied* (Minn. Feb. 24, 1988). The

court of appeals panel held there was no abuse of discretion in admitting evidence where it was relevant, more probative than prejudicial and Ostlund's participation in those acts was clear and convincing. *Id.* at 764.

Immediately after the birth of M.D.O., the county took custody of the child and filed a Petition for Dependency and Neglect. The county presented the Ostlunds with a case plan drafted pursuant to Minn. Stat. § 257.071, subd. 1 (1986). The first goal of the case plan required the Ostlunds to "provide a reasonable explanation of the death of Marie [sic] consistent with the medical findings." All subsequent case plans included this goal, which had to be completed before other goals, as the starting point for Janet Ostlund's rehabilitation.[1] On the advice of counsel, Ostlund refused to sign the case plan because of the pending criminal trial. Once convicted, Ostlund informed the county she intended to appeal and would not comply with the case plan. By that point, however, the county had already decided to seek termination of Ostlund's parental rights.

On July 16, 1987, the county petitioned for termination of Ostlund's parental rights, alleging (1) Ostlund had repeatedly refused or neglected to comply with the duties imposed by the parent-child relationship and (2) Ostlund was palpably unfit to be a party to that relationship because of a consistent pattern of specific conduct and specific conditions permanently detrimental to the child's health. *See* Minn.Stat. § 260.221, subd. (b)(2), (4) (1986).[2] Although the trial court precluded relitigation of whether Ostlund killed Maria by shaking, transcripts from Ostlund's criminal trial were introduced at the termination trial to prove Ostlund had repeatedly abused and mistreated Maria and other children in her care. David Ostlund and his daughters testified about Ostlund's care and treatment of Maria and the family dog. The county also offered the testimony of Steve Heckler and Jeanne Podvin, social workers assigned to Ostlund's case, who each testified an acknowledgement of one's destructive behavior is necessary for rehabilitation. The county's rebuttal witness, Dr. Sylvia Ashley–Cameron, offered opinions on Ostlund's potential for abuse of M.D.O. and Ostlund's responsibility for Maria's failure to thrive. She testified Ostlund was a habitual abusive parent, responsible for Maria's fractured arm, her failure to thrive, and her death. She also testified therapy is not likely to be effective if the parent cannot admit a problem with parenting and abuse. She explained that without an acknowledgement of one's problems, the therapist is unable to intervene with issues that initially led to the abuse. None of the six witnesses testifying at the termination proceedings on behalf of the county had any first-hand knowledge of Ostlund's be-

---

1. The marriage between David and Janet Ostlund was dissolved in February of 1988. Before then, the county drafted a separate case plan for David Ostlund in April of 1987, because David Ostlund was unsure whether he could care for M.D.O. given the emotional turmoil of the case. Termination of Janet Ostlund's parental right was the first goal listed in David Ostlund's case plan.

2. The provisions of section 260.221(b)(2), (4) state, in relevant part:

The juvenile court may, upon petition, terminate all rights of a parent to a child in the following cases:

\* \* \* \* \* \*

(b) If it finds that one or more of the following conditions exist:

\* \* \* \* \* \*

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able; or

\* \* \* \* \* \*

(4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child; Minn.Stat. § 260.221(b)(2), (4) (1986).

havior since her incarceration in February of 1987.

Ostlund presented evidence that an admission of culpability was not a precondition to effective therapy. This evidence came from the testimony of several psychologists and psychiatrists who had either worked with Ostlund or had spent time evaluating her. Dr. Candace Beaulieu, a licensed consulting psychologist who practiced at the Shakopee Correctional Facility, disagreed that psychological progress required an initial admission of guilt. Moreover, Dr. Beaulieu felt an admission would be inappropriate in Ostlund's case. Dr. Helga Midelfort, a certified psychiatrist, testified Ostlund's admitted responsibility for not properly supervising Maria was a starting point. Dr. Robert ten Bensel, a professor of Pediatrics at the University of Minnesota and recognized expert on child abuse, testified the admission of culpability should come in tandem with a psychiatric evaluation. There was also testimony from program directors at the prison and from nearly a dozen parents involved with Ostlund's day-care business, all of whom testified to Ostlund's good parenting skills.

The trial court dismissed the petition, finding the county had failed to meet its burden of proof and making specific findings of fact. It found Ostlund's conduct toward Maria showed incidents of abuse, but not a consistent pattern of abuse. It found an admission of a problem, though ultimately necessary, need not be the first step toward therapy, especially where experts testified Ostlund would respond better to supportive therapy.[3] It found Ostlund poses no current or foreseeable danger to M.D.O. and the best interests of M.D.O. were served by maintaining and strengthening a relationship with Ostlund. Following the trial court's decision, the county removed M.D.O. from foster care and returned physical custody to David Ostlund, who has had custody of the child during this appeal.

A divided court of appeals panel reversed. Believing its holding in Ostlund's criminal appeal constituted "law of the case," the court of appeals panel ordered termination based on the "consistent pattern of abuse" of Maria coupled with Ostlund's refusal to admit her culpability for Maria's death. *In re Welfare of M.D.O.*, 450 N.W.2d 655, 657–58 (Minn.App.1990). The majority opinion devoted particular attention to Ostlund's refusal to admit culpability even though there was no threat of self-incrimination. The court of appeals panel found Ostlund's refusal to make the required admission prevented sufficiently effective therapy to achieve adequate rehabilitation to assure the safety of M.D.O. *Id.* The panel found evidence of Ostlund's fitness as a parent unpersuasive because it included testimony of prison employees and psychotherapists who observed only supervised visits. *Id.* at 658. The dissent protested the termination of Ostlund's parental rights as an "unwarranted rush to judgment." *Id.* at 659 (Klaphake, J., dissenting).

## II.

The purpose of appellate review is to determine whether a trial court has made an error and not to try the case de novo. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 68 n. 2 (Minn.1979). To achieve that purpose, the reviewing court is governed by an appropriate standard of review, which does more than circumscribe the role of the reviewing appellate body. It ensures uniformity and consistency in the law by prohibiting the retrial of a case on appeal. When an appellate court ignores or abandons the standard of review, it usurps responsibilities properly left in the able hands of the trial court. *See Stapleton v. Riverview Speedways, Inc.*, 252 Minn. 548, 93 N.W.2d 193 (1958). Trial courts stand in a superior position to appellate courts in assessing the credibility of

---

**3.** At the time of its decision, the trial court also ordered a psychological evaluation of Janet Ostlund and later appointed Dr. Marion Hall, a psychologist agreeable to all the parties, to perform the examination. The report authored by Dr. Hall, submitted to the trial court in February of 1990, found Janet Ostlund was under no mental condition harmful to M.D.O. and M.D.O.'s best interests would be served by maintaining a relationship with Ostlund.

witnesses, and our cases echo this refrain. *See, e.g., Peterson v. Johnston,* 254 N.W.2d 360 (Minn.1977); *Cohen v. Steinke,* 223 Minn. 292, 26 N.W.2d 843 (1947). We have, on proper occasion, criticized the court of appeals for exceeding its role as an error-correcting body. *See Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn.1988). This case presents another such occasion. Despite the detailed factual findings of the trial court indicating the contrary, the court of appeals panel found Ostlund was "palpably unfit" to be a party to the parent and child relationship under section 260.-221(b)(4) based on the "consistent pattern of abuse" prior to Maria's death coupled with Ostlund's continuing refusal to admit culpability for that death. *Welfare of M.D.O.,* 450 N.W.2d at 658.[4] That holding erroneously applies the "law of the case" doctrine and strays beyond the established standard of review into the fact finding domain of the trial court.

Parental rights are terminated only for grave and weighty reasons. *In re Welfare of HGB,* 306 N.W.2d 821, 825 (Minn.1981). The standard of review is, therefore, well defined. The appellate court must determine whether the trial court's findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether those findings are clearly erroneous. *In re Welfare of C.K.,* 426 N.W.2d 842, 847 (Minn.1988). The child's best interests, however, remain the paramount consideration in every termination case. *In re Welfare of J.W.,* 391 N.W.2d 791, 794–95 (Minn.1986), *cert. denied,* 479 U.S. 1040, 107 S.Ct. 899, 93 L.Ed.2d 850 (1987); *In re Welfare of J.J.B.,* 390 N.W.2d 274, 279 (Minn.1986); *see* Minn. Stat. § 260.221, subd. 4 (1988). Advancing the child's best interests is the state's paramount goal even when circumstances require intervention. Note, *Minnesota Adopts a Best Interests Standard in Parental Rights Termination Proceedings:*

In re J.J.B., 71 Minn.L.Rev. 1263, 1268 (1987). The trial court found no "consistent pattern of abuse" by Ostlund. Describing this finding as influenced by an error of law, the court of appeals panel held the decision in Ostlund's criminal appeal constituted "law of the case" and her conduct constituted "a consistent pattern of abuse." *Welfare of M.D.O.,* 450 N.W.2d at 658. Besides disregarding the trial court's specific findings to the contrary, it is itself error to apply "law of the case" in this situation.

*Law of the Case and Issue Preclusion.*

 The "law of the case" doctrine commonly applies to issues decided in earlier stages of the same case. *Little Earth of United Tribes, Inc. v. Department of Housing,* 807 F.2d 1433, 1438 (8th Cir. 1986); *see Mattson v. Underwriters at Lloyds of London,* 414 N.W.2d 717, 719–20 (Minn.1987). The doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the *same issues* in subsequent stages in the *same case.*" *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (emphasis added). By contrast, issue preclusion or collateral estoppel operates to prevent relitigation of matters where (1) the issue is identical to one in a prior adjudication, (2) there was a final judgment on the merits, (3) the estopped party was a party in the prior case, and (4) there was a full and fair opportunity to be heard on the issue. *Kaiser v. Northern States Power Co.,* 353 N.W.2d 899, 902 (Minn.1984); *Hauser v. Mealey,* 263 N.W.2d 803, 806 (Minn.1978); *see also* Restatement (Second) of Judgments § 27 (1982). Collateral estoppel can also attach to issues determined by a criminal conviction. *See Travelers Insurance Co. v. Thompson,* 281 Minn. 547, 163 N.W.2d 289 (1968); *see also Prosise v. Haring,* 667 F.2d 1133 (4th Cir.1981), *aff'd* 462 U.S. 306,

---

4. The court of appeals panel opinion incorrectly references the 1988 version of this statute. Section 260.221 was amended in 1988, designating existing text as subdivisions 1 and 2, and adding the language "and reasonable efforts by the social service agency have failed to correct the conditions that formed the basis of the petition"

to the end of subdivision 1(b)(2). Act of April 14, 1988, ch. 514, § 8, 1988 Minn.Laws 402, 406–08. This error was inconsequential because the court of appeals relies on the renumbered, yet unmodified, language of subdivision 1(b)(4) as supporting termination.

103 S.Ct. 2368, 76 L.Ed.2d 595 (1983); *Lettsome v. Waggoner,* 672 F.Supp. 858 (D.V.I. 1987); *Knoblauch v. Kenyon,* 163 Mich. App. 712, 415 N.W.2d 286 (1987); *see generally* Restatement (Second) of Judgments § 85 (1982). Neither issue preclusion nor "law of the case" applies where the issue has not yet been litigated or decided at trial or on appeal.

■ The fact of Ostlund's conviction does not permit finding of "a consistent pattern of abuse" because it is not an element of the crime for which she was convicted. Ostlund was charged with and convicted of second-degree murder in the commission of a third-degree assault, and a "consistent pattern of abuse" is not an essential element of either offense. *See* 10 Minn.Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 11.16, 13.08 (2d ed. 1985). The jury was never instructed to consider nor was the state required to prove "a consistent pattern of abuse" in the criminal case. *See Thompson,* 281 Minn. at 555, 163 N.W.2d at 294 (criminal conviction is conclusive evidence of facts upon which conviction is based). In her appeal from the conviction, Ostlund assigned error to the admission of *Spreigl* evidence. *State v. Ostlund,* 416 N.W.2d 755, 758 (Minn. App.1987) ("4. Did the trial court err in admitting *Spreigl* evidence?"), *pet. for rev. denied* (Minn. Feb. 24, 1988). When examining whether the evidence satisfied the requirements for admission of *Spreigl* evidence, the court of appeals panel said:

> This testimony is admissible circumstantial evidence that Maria had been subjected to abuse and neglect while living with [Ostlund]. *The fact that these injuries occurred while Maria was in [Ostlund's] care is clear and convincing evidence of [Ostlund's] participation.* This evidence is also admissible to illuminate the relationship between [Ostlund] and Maria.

*Id.* at 764, *quoted in In re Welfare of M.D.O.,* 450 N.W.2d 655, 657 (Minn.App. 1990) (emphasis added and citation omitted). This leads to the inevitable, albeit unstated, holding that there was no abuse of discretion in admitting the evidence of Ostlund's prior "bad acts" because Ostlund's participation in those acts was clear and convincing.[5] Counsel for both prosecution and defense would have no need to argue the conduct involved "a consistent pattern of abuse" when the standard for admitting the *Spreigl* evidence does not require that determination.

Neither the jury nor the court of appeals panel considered, much less found, whether Ostlund's conduct denoted "a consistent pattern of abuse." Before a criminal conviction precludes the subsequent relitigation of issues decided in the criminal case the issues raised must be identical. *See Thompson,* 281 Minn. at 550, 163 N.W.2d at 291 (facts and issues in both actions were identical). Although the facts surrounding Ostlund may be the same in both actions, the issues under consideration differ completely. The trial court's order correctly precluded relitigation of Ostlund's criminal culpability for Maria's death by shaking, and that order became "law of the case." That same order did not foreclose determination of whether Ostlund's conduct satisfied the statutory language under section 260.221(b)(4).

*Findings of Fact and Admission of Culpability.*

■ Avoiding the established standard of review, the court of appeals panel substituted its findings for those of the trial court and ordered termination under section 260.221(b)(4). Section 260.221(b)(4) permits termination where a parent is palpably unfit "because of a *consistent pattern of specific conduct before the child* or of *specific conditions directly relating to the parent and child relationship* either of which are determined by the court to be permanently detrimental to the physical or mental health of the child." Minn.Stat. § 260.221(b)(4) (emphasis added). The burden under section 260.221(b)(4) is onerous.

---

5. The finding of Ostlund's participation in the abuse of Maria "puzzled" the trial court on this matter because Ostlund was not the sole caretaker of Maria when those injuries occurred. The testimony at the criminal trial indicated Ostlund's step-children cared for Maria in the two days before Dr. Goldfarb discovered the fractured arm.

The petitioning party must prove a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that appear will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child. *In re Welfare of R.M.M.*, 316 N.W.2d 538, 542 (Minn.1982); *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980); Minn.Stat. § 260.221(b)(4).[6] The court of appeals panel did not specify what "consistent pattern of conduct" or "specific conditions" were permanently detrimental to the welfare of M.D.O. Rather, the court of appeals found an admission of Ostlund's culpability was a prerequisite for effective rehabilitation, implying Ostlund's refusal to offer that rehabilitative admission is "permanently detrimental" to the child. *Welfare of M.D.O.*, 450 N.W.2d at 657–58. This raises the most troubling issue in this matter.

The county syllogizes an admission of culpability is necessary for effective therapy, Ostlund refuses to admit culpability, so, therefore, Ostlund cannot benefit from therapy and cannot be rehabilitated. The county's expectations seem especially daunting considering the county's admitted failure to provide services, counseling or assistance to aid Ostlund in coming to grips with her conduct. It never told Ostlund what programs at the Shakopee institution would be appropriate for her to satisfy the case plan. It never contacted the leaders of therapy programs Ostlund joined. The social worker observed only one visit between M.D.O. and Ostlund. Moreover, the county's expectations are conflicting. Steve Heckler, the first social worker assigned to the case, testified the county wanted an explanation of Maria's death consistent with medical findings and not necessarily an admission by Ostlund. The next social worker assigned to Ostlund's case, Jean Podvin, testified Ostlund must admit responsibility for Maria's failure to thrive and for a pattern of abuse against Maria, not to mention admitting responsibility for shaking the child to death. According to Podvin, however, Ostlund could have satisfied the goal by saying "I think I really do need some help." The county social workers did not communicate any of these expectations to Ostlund because they felt Ostlund did not need to be told what kinds of things would satisfy the first case plan goal. The county never even asked Ostlund whether she would comply with the case plan drafted on July 21, 1987. Notwithstanding, the county concedes Ostlund was fulfilling other case plan goals.

We have expressed our reluctance at entering the psychological debate on whether an initial admission of culpability is a prerequisite to rehabilitative therapy. In *In re Welfare of J.W.*, 415 N.W.2d 879 (Minn. 1987), we said:

[I]t would seem a difficult task to engage in any effective therapy without confronting honestly one's own inadequacies * * *. [I]t remains to be seen whether a

6. Most cases decided under section 260.221(b)(4) rely on the "specific conditions" language as opposed to the "consistent pattern of specific conduct" language. *See In re Welfare of P.J.K.*, 369 N.W.2d 286, 290–291 (Minn.1985) (mental retardation); *In re Welfare of D.I.*, 413 N.W.2d 560, 565 (Minn.App.1987) (mental illness, chemical dependency and limited intellectual functioning); *In re Welfare of N.C.K.*, 411 N.W.2d 577, 580 (Minn.App.1987) (mental illness and mental retardation); *In re Welfare of B.M.*, 383 N.W.2d 704, 706 (Minn.App.1986) (mental illness); *In re Welfare of W.R.*, 379 N.W.2d 544, 548 (Minn.App.1985) (no specific conduct cited; children feared placement and visitation with father); *In re Welfare of T.M.D.*, 374 N.W.2d 206, 207 (Minn.App.1985) (borderline retarded, I.Q. of 70); *In re Welfare of B.C.*, 356 N.W.2d 328, 331 (Minn.App.1984) (mother's psychological state, along with conduct, supported termination). Those few cases relying on the "consistent pattern of specific conduct" language focus on the parent's conduct toward the child-subject of the petition. *See In re Welfare of C.L.L.*, 310 N.W.2d 555, 558 (Minn.1981) (parents had not held steady jobs, frequently moved, and their excessive drinking caused them to miss visitation with the children on important dates); *In re Welfare of C.D.*, 393 N.W.2d 697, 701 (Minn.App.1986) (consistent pattern of violence, instability and inconsistency); *In re Welfare of L.M.M.*, 372 N.W.2d 431, 432–33 (Minn.App.1985) (parent could not manage financial affairs, physically and sexually abused the child, and demonstrated indifference towards the child's needs). Compare *In re Welfare of T.M.D.*, 374 N.W.2d 206, 212 (Minn. App.1985), in which the mother's psychological *condition* warranted termination of rights to a child not yet abused.

less than candid therapy will suffice to make appellants good parents.

*Id.* at 884. The trial court in *Welfare of J.W.* assumed an admission was necessary before treatment; an assumption the parents were free to disprove. *Id.* This matter does not contain the same assumption; rather the trial court specifically found an admission was not a necessary predicate to completion of other case plan goals. The trial court's finding is supported by the substantial testimonial evidence of several psychologists and psychiatrists.

■■■ Without explanation of why or how the trial court's finding was unsupported or clearly erroneous, the court of appeals panel made its own findings. *Welfare of M.D.O.*, 450 N.W.2d at 658 (citation omitted). It stressed "there was no finding of rehabilitation in this case." *Id.* This reasoning misconstrues section 260.221 and the burden it places on the county in termination cases. If, as here, the county alleges the refusal to comply with the case plan requirement of admitting culpability impedes rehabilitation and is detrimental to the parent-child relationship under section 260.221(b)(4), then the county must prove not only the parent is not and cannot be rehabilitated in the foreseeable future, but that the lack of rehabilitation is permanently detrimental the child's welfare. This is true whether or not the case plan is ordered by the court, because the refusal to comply could affect rehabilitation if, as the county argues, compliance is truly necessary for effective therapy and rehabilitation. *Cf. Welfare of J.W.*, 415 N.W.2d at 883 (therapy that does not include admission may be ineffective and impair chances of regaining children). If the county considers rehabilitation without an initial admission of culpability impossible,[7] it bears the onus of proving the necessity of an admission prerequisite. Based on the trial court's findings, the county did not accomplish that here. Because the therapeutic treatments contemplated by the county have not yet been tried, we can only reiterate, that "it remains to be seen whether a less than candid therapy will suffice to make" Ostlund a good parent. *Welfare of J.W.*, 415 N.W.2d at 884.

■■ The trial court found no clear and convincing evidence that Janet Ostlund fits the pattern of an abusive parent likely to repeat abusive acts. It found Ostlund had profited from those treatment programs available in prison and, if given the opportunity, Ostlund would be a good candidate for therapy. Furthermore, the trial court found an admission of culpability was not necessary before Ostlund could benefit from therapy, noting "[Ostlund] has admitted her shortcomings as a parent and has opened herself up to the benefits of counseling and found it to be helpful." Most importantly, the trial court found it is in M.D.O.'s best interests to maintain and strengthen the relationship with Ostlund. Here, the evidence clearly supports the trial court's findings on these issues and the court of appeals panel erred in substituting its findings for those of the trial court.[8]

*Best Interests of M.D.O.*

■■ The best interests of the child is a paramount consideration and our ultimate focus remains on the best interests of the child balanced against the parental rights. *In re Welfare of J.W.*, 391 N.W.2d 791, 794–95 (Minn.1986); *In re Welfare of J.J.B.*, 390 N.W.2d 274, 279 (Minn.1986); *see* Minn.Stat. § 260.221, subd. 4 (1988). The facts presented in this case were described in long and often contradictory testimony. After listening to the conflicting

7. The dissenting judge in the court of appeals panel described the county's case plan as "less of a plan designed to reunite Ostlund and M.D.O. than to obtain an admission of guilt from Ostlund while she was exhausting her appeal rights." *Welfare of M.D.O.*, 450 N.W.2d at 659 (Klaphake, J., dissenting).

8. At oral argument before this court, the county claimed recent legislation creates a rebuttable presumption supporting termination of parental rights where a parent is convicted of causing the death of another of the parent's children. Act of May 8, 1990, ch. 542, § 15, 1990 Minn.Laws 1477, 1491. Since the statute does not apply retroactively, we save its consideration for another day. Suffice it to say, however, the evidence in this case more than rebutted any presumption created by this statute.

evidence, the trial court found it is in M.D. O.'s best interests to maintain and strengthen the relationship with Ostlund. The trial court articulated the basis for the "best interests" determination as well as specific findings on Ostlund's interaction with the child. In reaching that determination the trial court considered the likelihood of adoption, the effect termination would have on the child, the potential danger to the child if returned to parental custody, the length of time in foster care, and the bond forged between the parent and child. M.D.O. is now over four years old, and Ostlund has been afforded periodic visitation while incarcerated at the Shakopee correctional facility. Foster care placement is also no longer a consideration because M.D.O. is now residing with the biological father, subject to Ostlund's periodic visitations. *Welfare of M.D.O.*, 450 N.W.2d at 656. The trial court expressed its opinion as to those witnesses it found to be credible and those that were not. These findings are supported by the evidence. There is no similarity to the findings criticized by this court in *In re Welfare of M.M.*, 452 N.W.2d 236, 239 (Minn.1990).

### III.

Ostlund argues the failure of a court of appeals judge to recuse himself *sua sponte* as a member of the panel in this matter constituted prejudicial error because he was also a member of the panel that reviewed Ostlund's criminal appeal. This argument is meritless, unpersuasive, and was never preserved as an issue below. Apart from speculation and conjecture, nothing indicates the court of appeals panel based its decision on matters other than the evidence presented. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *Moore v. McGraw Edison Co.*, 804 F.2d 1026, 1032 (8th Cir.1986). Ostlund waived the issue by never alerting the court of appeals to the issue. *See* Minn.Ct.App.Int.R. 6.2, 6.3; *see also State ex rel. Wild v. Otis*, 257 N.W.2d 361, 363–64 (Minn.1977) (recusal of an appellate judge is a decision for the individual judge to make). The failure to raise and preserve an issue before the court of appeals constitutes a waiver in a subsequent appeal to this court. *See L & H Transport, Inc. v. Drew Agency, Inc.*, 403 N.W.2d 223, 226 (Minn.1987). More importantly, the issue is so frivolous and so lacking in merit, it should never have been raised before us as it was under the circumstances here. The judge questioned by Ostlund is an able, ethical and honorable jurist. Raising the issue, without offering the barest spark of supporting evidence, is an unfair and highly improper criticism of a well-respected appellate judge.

### IV.

Janet Ostlund may not be the picture of a model parent. Yet, few children would be reared by natural parents if model parents were the standard. *In re Welfare of D.C.*, 415 N.W.2d 915, 919 (Minn. App.1987) (Huspeni, J. dissenting). The best interests of the child is a paramount consideration and our ultimate focus remains on the best interests of the child balanced against the parental rights. Here, the best interests of M.D.O. are in maintaining a nurturing relationship and bonding with the natural mother, Janet Ostlund. The court of appeals panel erred when it exceeded the appropriate standard of review, ignored the trial court's specific findings of fact, and substituted its judgment regarding the best interests of the child.

Reversed.