*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0482**


In the Matter of the Welfare of the Children of:
T.W., Parent.


**Filed August 10, 2015
Affirmed
Stoneburner, Judge***

Hennepin County District Court
File No. 27-JV-14-4798


Mary F. Moriarty, Chief Hennepin County Public Defender, David W. Merchant, Assistant Public Defender, Minneapolis, Minnesota (for appellant T.W.)

Mary F. Moriarty, Chief Hennepin County Public Defender, Patricia M. Nevin, Assistant Public Defender, Minneapolis, Minnesota (for respondent C.M.)

Kiri Somermeyer, Bruce Jones, Faegre Baker Daniels LLP, Minneapolis, Minnesota (for respondent guardian ad litem VeNita Schnebele)

Michael O. Freeman, Hennepin County Attorney, Cory A. Carlson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)


        Considered and decided by Peterson, Presiding Judge; Stauber, Judge; and Stoneburner, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**STONEBURNER**, Judge

Appellant mother challenges termination of parental rights to four of her children, arguing that the district court erred by finding that: (1) respondent county made reasonable efforts to correct the conditions that led to out-of-home placement and to reunify the family; (2) the record supports the statutory bases for termination of parental rights alleged by the county; and (3) that termination of parental rights is in the best interests of the children. Because the record supports at least one of the statutory bases for termination of parental rights alleged by the county and that termination of parental rights is in the best interests of each child, we affirm.

## FACTS

Four children of appellant T.W. (mother) came to the attention of respondent Hennepin County Human Services (county) on June 28, 2013, when twin daughters K.C.W. and K.S.W. (date of birth April 17, 2005), son K.E.W. (date of birth September 28, 2007), and daughter K.E.W. (date of birth December 16, 2008) were found unattended in a filthy apartment with a knife on the floor and no food. Their caregiver had abandoned the children after notifying the police that she was leaving because mother had failed to timely return from an apartment search in Austin. In addition to being alarmed by the condition of the apartment and lack of supervision, the responding police officer was concerned about reports from the children of physical abuse and that son K.E.W. had been choked by mother's boyfriend.

The county was notified and the children were taken to St. Joseph's Children's Home. The county filed a petition seeking adjudication of the children as in need of protection or services (CHIPS). Mother admitted the petition based on her failure to make proper arrangements for their care.

The children have remained in out-of-home placement since June 28, 2013. As a result of assessments after out-of-home placement, the three older children have been diagnosed with asthma, and each exhibits symptoms of reactive attachment disorder. K.C.W. is "parentified": she feels obligated to act as parent to her siblings and to her mother. She is being reassessed for ADD/ADHD and her foster mother has noted symptoms of a defiance disorder. K.S.W. is the conciliator in the family, seeking harmony when there is discord. She will curl up under a table and cry when there is too much discord. Son K.E.W. is described as "mischievous" and has some behavioral issues that manifest in school. Daughter K.E.W. is developmentally disabled. She has an individual education plan (IEP) to address her disability, but is not doing well in school.

Each child has the services of a therapist. The twins were school-age when the CHIPS case started but were not in school; they have made progress but are a year behind their age group. All of the children are considered "special needs" children. The children have not requested contact with mother since visitation was suspended and have not expressed disappointment due to lack of contact.

Mother began receiving social security disability benefits as a minor: she is not fully aware of why she receives these benefits, but has stated that her mother "called it handicap delayed." Mother recognizes that her youngest child, daughter K.E.W., has

3

disabilities similar to her own, but she has no insight into the special needs of the other children, insisting that they did not have any physical or mental health issues when they were with her.

Mother's case plan, in relevant part, required mother to complete parenting education and follow all recommendations; undergo a psychological evaluation and follow all recommendations; complete an anger-management program; maintain safe and suitable housing; and cooperate with her social worker and the children's guardian ad litem.

Mother's psychological evaluation revealed "severe deficits in cognitive ability," including a "severe deficiency in [mother's] ability to reason with nonverbal information," a "severe deficiency in her ability to hold information in immediate memory," and "deficits in attention and concentration." Mother's full scale IQ is 57. The assessing psychologist describes mother's overall adaptive functioning as "consistent with developmental age equivalency of 12 years and 9 months old." The evaluating psychologist recommended: (1) developmental disability services to assist her with resources; (2) a parenting assessment to provide mother with a "better understanding of her abilities to care for her children"; (3) a one-on-one format for parenting training due to concern that mother's "low intellect" may impair her ability to take in, understand, and ultimately benefit from training presented above her cognitive level; (4) individual therapy to assist with "managing vulnerability"; and (5) domestic-abuse support services "to assist her in processing dynamics related to relational victimization and ways of establishing a safer environment for herself and her children."

Mother rejected developmental disability services and did not follow through with individual therapy, but mother completed programming from FamilyWise Services that was specifically adjusted for mother's cognitive deficits.

Through FamilyWise, mother was scheduled to participate in parent-education and child-development classes twice each week and also participated in psychoeducation classes including: women's health, mental health, sexual violence, domestic, healthy relationships, and life skills. Mother worked with FamilyWise program from August 2013 through April 2014, when she completed the program. Her attendance was "consistent," though she had problems with tardiness. Through FamilyWise, mother received parenting coaching during supervised visits with the children. Although mother was able to use some of what she learned, she was inconsistent in implementing new skills. And despite completing an anger-management program, mother made no progress in disciplining the children. The guardian ad litem (GAL) testified that mother made no improvement in empathy, which the GAL described as legitimate listening to and responding to the children.

After mother completed FamilyWise programing, parenting coaching was no longer offered during supervised visitation, based on the county's determination, in consultation with the GAL and a public-defender's office dispositional advisor, that those services had "come to an end" and that mother should be given the opportunity to demonstrate any advancements in her skills prior to a termination of parental rights (TPR) petition filing. Visitations without the parenting coach became disruptive, inconsistent, and harmful to the children.

At a review hearing in the CHIPS case, the county asked the district court to suspend visits until mother either engaged in additional services or re-engaged and met regularly with the social worker to address scheduling and her behavioral issues during visits, or, in the alternative, to require mother to call one hour in advance to confirm that she would be there on time and to change the visits to "therapeutic" visits so that a supervisor could intervene more. The district court reduced the visits with mother from two hours to one hour, ordered that the visits be therapeutic, and required mother to call one hour before the visits to confirm her attendance. But at the next review hearing, the district court suspended mother's visits with the children stating, "I simply cannot find that [visits] are in the kids' best interest right now . . . . [G]iven your inability to handle the situation when you're with the kids without major supervision and intervention, I simply am going to suspend visits for the foreseeable future . . . ."

Continuing areas of concern for the county throughout the CHIPS proceedings were domestic-abuse issues and mother's lack of stable housing.

Mother consistently denied that she or her boyfriend ever "put bruises" on the children or used a broom or belt as the children reported. Mother described a "particular time" when "all of us [were] in the living room playing . . . [and] everybody had brooms and belts," but denied any bruising. Mother also denied that she was abused by her boyfriend. Based on reports from the children and evidence of mother's reports to others that she has been abused by her boyfriend, the district court found mother's denials not credible and found that mother and the children are victims of domestic abuse.

6

The county was unable to determine if mother had safe and suitable housing for herself or the children because mother failed to provide information about housing. At some point she stopped living with her boyfriend and stayed in shelters, but she left or was asked to leave after short stays. Mother did not keep the social worker or GAL informed of where she was living. Although she testified at the TPR trial that she had been in the same private residence since October 2014, she was unable to provide the address.

In July 2014, the county petitioned to terminate mother's parental rights to the four children in its care, citing four statutory grounds for TPR and that TPR is in the best interests of the children. After a multi-day trial, the district court granted the petition, concluding that the county had established the four alleged statutory bases for TPR by clear and convincing evidence and that TPR is in the best interests of the children. This appeal followed.

## D E C I S I O N

Mother's argument on appeal focuses somewhat narrowly on assertions that (1) the county failed to provide statutorily required reasonable efforts to correct the conditions that led to out-of-home placement and to reunify the family because it "unilaterally" ended one-on-one parenting coaching before the TPR trial; (2) the county failed to make reasonable reunification efforts because it did not seek out a foster-family placement for mother and all of the children that might have permitted them to remain together; and (3) the record showed that mother "substantially addressed the conditions" that led to out-of-home placement.

7

On review of a TPR decision, we "must determine whether the [district] court's findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether those findings are clearly erroneous." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). Proof of any one of the statutory bases for TPR will support a TPR decision that is in the best interests of a child. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). We review a district court's determination that a statutory basis for TPR has been proved for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). We defer to the district court's findings of underlying facts unless they are clearly erroneous. *Id.* at 901. A finding of fact is not clearly erroneous unless it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). But we examine the sufficiency of the evidence to determine whether it is clear and convincing. *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996).

Although the district court found that the county had proved by clear and convincing evidence each of four statutory bases for TPR, we only address one of the statutory grounds: palpable unfitness. Minnesota law provides, in relevant part, that TPR may be granted if the district court finds, based on clear and convincing evidence:

> [T]hat a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that

8

renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4) (2014). The district court concluded that mother demonstrated "a pattern of inability to meet the needs of the children," constituting "a specific pattern of conduct relevant to parenting her children." Specifically, the district court found that mother "has been unable to meet the needs of the children due to her lack of empathy and inability to retain and apply proper parenting skills."

Cognitive deficiencies are insufficient to support TPR unless those deficiencies directly affect the ability to parent and "will continue for a prolonged, indefinite period and [] are permanently detrimental to the welfare of the child." *T.R.*, 750 N.W.2d at 661 (reversing TPR based on palpable unfitness due to lack of evidence that father's lack of sobriety directly related to his relationship with his child, made him unable for the foreseeable future to care for the child's needs, or that there was a causal connection between father's substance use and his inability to care for his child).

Based on the testimony of the psychologist who evaluated mother, mother concedes that she has "a 'condition' that relates to the parent-child relationship, and . . . this condition 'will last for the reasonably foreseeable future.'" But mother argues that because the district court did not make a specific finding that mother's condition is permanently detrimental to the children's welfare, termination under this subdivision is clearly erroneous. We disagree.

In this case, the psychologist's testimony coupled with evidence of mother's inability to provide stable housing; secure an adequate support system; demonstrate

9

sustained, appropriate parenting skills after nine months of intensive services; and her ongoing inconsistent and hurtful behavior toward her children, whom she clearly loves, constitute clear and convincing evidence that mother's condition is permanently detrimental to the children's welfare. The finding of permanent detriment is implicit in the district court's detailed findings.

Mother admits her vulnerability to manipulation and abuse, which interfered with her ability to find stable housing and protect the children from abuse even before the county became involved with this family. Mother's refusal to address domestic-abuse issues in order to take responsibility for protecting her children from physical abuse supports the district court's conclusion that she is palpably unfit to parent these children. *See T.A.A.*, 702 N.W.2d at 708 (holding that evidence of a mother's failure to recognize her responsibility to protect her children from abuse is clear and convincing evidence to support the district court's determination that her parental rights should be terminated based on palpable unfitness).

Mother correctly argues that despite the lack of reference to "reasonable efforts" in Minn. Stat. § 260C.301, subd. 1(b)(4), the supreme court has held that the reasonable-efforts requirement applies to this subdivision. *See S.Z.*, 547 N.W.2d at 892 ("We conclude that when parental rights are terminated because the parent is palpably unfit to be a party to the parent and child relationship, the Act requires that the court make the determination of whether reasonable efforts have been made to rehabilitate the parent and to reunite the family, even if that determination is that provision of services for the purpose of rehabilitation is not realistic under the circumstances."). "Whether the county

has met its duty of reasonable efforts requires consideration of the length of the time the county was involved and the quality of effort given." *In re Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. App. 1990), *review denied* (Minn. July 6, 1990).

The district court made extensive findings about the county's efforts to correct conditions leading to placement and to return the children to mother. Mother argues that the county impermissibly terminated "parenting education" on its unilateral determination of futility, a finding that can only be made by the district court. *See* Minn. Stat. § 260.012(a)(7) (2014) (requiring that the county provide reasonable services "except upon a determination by the court that . . . the provision of services or further services for the purpose of reunification is futile . . . ."). But the record reflects that the county did not end reasonable services to mother: parenting coaching was initially discontinued because mother had completed the FamilyWise program after nine months of parenting education and therapeutic visits were resumed to allow intervention during visits. Mother has not provided any authority that the end of one component of services constitutes termination of services that requires a court finding of futility. We find no merit in mother's argument that failure to extend the parenting-coaching component of services precludes the district court's finding that the county fulfilled its statutory obligation to provide reasonable services. Similarly, we find no merit in mother's argument that the county's failure to seek out a foster family that would foster mother and all four children precluded the district court from finding that the county met its burden to provide reasonable reunification services. The record does not reflect that such a program exists, and mother does not provide any authority that the county's failure to

11

create such a program for her precludes a finding that the county provided reasonable reunification services. The district court did not err by finding that the county met its burden to make reasonable efforts to correct conditions leading to placement and to reunify this family.

Mother, without citing any authority, appears to assert that she cannot be deemed palpably unfit because the evaluating psychologist testified that it is "not impossible" for a person with mother's cognitive disabilities to parent "with a lot of support . . . [including] . . . a family support system, some government funded services, monitoring[,] . . . maybe some in-home services," and that the county was obligated to provide such support. We find no merit in this assertion and conclude that the district court did not err in finding that mother is palpably unfit to parent these children and did not abuse its discretion in concluding that a statutory basis exists for TPR.

Because only one statutory basis is necessary to support TPR, we decline to address the remaining three statutory bases relied on by the district court.

Although not identified as an issue on appeal, mother's brief asserts in a conclusory manner that "the children's best interests are not served by separation from one another and from their mother, who was case plan compliant and doing the best she can to address the reasons causing [out-of-home placement]." The district court set out in detail the reasons for its conclusion that TPR is in the best interests of these children. Mother does not assert or brief an argument that the district court's best-interests findings are clearly erroneous. Issues not briefed on appeal are waived. *Melina v. Chaplin*, 327

N.W.2d 19, 20 (Minn. 1982). And the record supports the district court's determination that TPR is in the best interests of each child involved in this case.

**Affirmed.**