In re the Matter of the WELFARE OF:
B.M., L.M., K.M., K.M., J.M.,
B.M., and A.M.

No. C5–85–1258.

Court of Appeals of Minnesota.

March 11, 1986.

Review Denied May 22, 1986.

Jerry P. Probst, Roseau, for appellant Father.

Eric P. Johnsrud, Winona, for appellant Mother.

Ann Carrott, Douglas Co. Atty., Michael J. Dolan, Asst. Co. Atty., Alexandria, for respondent County.

William J. Leuthner, Alexandria, for Children.

Heard, considered and decided by FORSBERG, P.J., and LANSING and RANDALL, JJ.

## OPINION

FORSBERG, Judge.

This is an appeal from a judgment terminating the parental rights of appellants with respect to seven of their eight children. We affirm.

## FACTS

There are eight children in the family. The oldest is now 18 and had been voluntarily placed by the parents in a children's home. Parental rights as to the oldest child are not at issue.

The family has a long history of involvement with the county welfare agency and the courts, beginning in 1970. This history includes numerous incidents of physical abuse or threats of abuse by the mother, the mother's intermittent hospitalization for mental problems and chemical dependency, and the removal of the children for foster care placement. More recently there has been sexual abuse by the oldest son, as well as physical abuse either admitted by him or suspected. At the time of the termination hearing, the ages of the other children were as follows:

| | |
|------|------|
| B.M. | 15 |
| L.M. | 14 |
| K.M. | 11 |
| K.M. | 10 |
| J.M. | 6 |
| B.M. | 2 |
| A.M. | 11 months |

The oldest children, B.M., L.M., and K.M., were placed in foster care in September, 1974, following the filing of a petition to terminate parental rights. The petition was denied but the children were found to be neglected and placed in foster care. L.M. and K.M. have remained in their current foster home since 1979, with home visits and visitation by their parents. B.M. was returned to the parents' home in August, 1978, but removed after 7 months. She has recently been moved to another foster home.

Both B.M. and L.M. suffered physical abuse at the hands of their mother. Both were poisoned with phenobarbitol in 1970, and the mother admitted throwing L.M. against a wall. In July, 1971, L.M. was severely bruised, although the mother denied any abuse. In September, 1972, the mother admitted to striking L.M.'s arm with a hammer, resulting in a fracture. In March, 1973, the mother stated she had purposely dropped acid on B.M. and L.M., as well as the oldest child.

K.M. was born in August, 1973, and apparently suffered no abuse. He is characterized by the psychologist who evaluated the children as the most well-adjusted of the children. He has a strong attachment to his foster mother, and seldom talks of his natural parents.

L.M. is also described as well-adjusted in the foster home. She expresses a desire to return to the family home, but does not remember living there, and recognizes the unlikelihood of any return.

B.M., the oldest of these children, is described as the least well-adjusted and the most affected by the family separation. She is very concerned over what is to happen to the family, wants to protect the other children, and lacks trust in people outside the family. She wants to return to the home. Her psychologist, however, believes she is fantasizing about conditions in the home, and trying to bear the burden of keeping the family together. He recommends termination of parental rights, believing that this definite outcome would ease her burden, and help her deal with reality, although he recognizes she will always have serious emotional problems.

The middle children, K.M., age 10, and J.M., age 6, have spent the most time in the family home.

K.M. was found to be neglected and placed in foster care shortly after birth. This followed discovery of third-degree burns thought not to be accidental, and the mother's unrelated admission that she left the child in a car with the windows rolled up on a hot day. The mother was admitted to a detox facility and then committed to the state hospital when K.M. was 4 months old. K.M., however, was returned to the family home after only 3 months, where she remained for over 3 years.

In 1979, K.M. and the infant J.M. were placed in foster care following the mother's admission to the use of drugs, including heroin. They returned home in August, 1980, and remained home, except for a

short period of voluntary placement, until commencement of these proceedings in August, 1984.

Both K.M. and J.M. were sexually abused by the oldest child during 1982 and 1983. The parents became aware of this abuse, but did not report it to authorities. They voluntarily placed the oldest child in the St. Cloud Children's Home in February, 1983. The county contends, however, that this placement was due to the boy's general disobedience rather than the sexual abuse. The sexual abuse recurred during a home visit by this child in November, 1983. A neglect petition based on the sexual abuse was filed in January, 1984. The parents admitted the allegations and K.M. and J.M. were placed in the family home. They were removed in August, 1984, and placed in a foster home together.

K.M. is an emotionally troubled girl with some of the same problems as her older sister, B.M. She sees herself as responsible for younger siblings, wants to return home but is depressed about the home situation, and is defensive about her parents. J.M., on the other hand, was a favored child in the home, and is a happy and well-adjusted child.

The youngest group of children is the infants, B.M. and A.M. B.M. has experienced significant physical abuse, either admitted by the oldest child or suspected to have been perpetrated by him. In February, 1983, his feet were burned by boiling water while this child was babysitting him. The oldest boy later admitted committing this abuse. In April, 1983, B.M. was admitted to the hospital in a semi-comatose state, again following babysitting by the oldest boy. The pediatrician who examined B.M. felt strongly that the injury was caused by physical abuse, but could not eliminate other possible causes. B.M. also had been seen with large bruises in 1982 that were suspected to be inflicted, and had respiratory problems unusual for his age.

B.M. was found to be neglected in June, 1983, and placed outside the home. On August 1, 1984, he was hospitalized with a prolapsed rectum following a home visit. This injury was caused by trauma to the rectum, strongly suspected of being intentionally inflicted. The oldest boy was not at home when this injury occurred.

The following week, on August 8, the welfare agency received a report that the mother had threatened to poison the youngest child, A.M., with Drano. Although no Drano was found, K.M., J.M. and A.M. were removed from the home. Neglect petitions were filed on all three children, and adjudicated, but formal disposition was stayed pending filing and disposition of these petitions to terminate parental rights.

The mother was voluntarily admitted to a state hospital following the August 8 removal of the children. She has since been released and was living outside the family home at the time of the hearing.

The mother has been evaluated by two psychologists, both of whom testified at the hearing. Dr. Jesseph testified as to her history, including sexual and physical abuse at an early age and institutionalization from age ten to eighteen. He stated she has a low average IQ, has psychotic episodes, often triggered by the birth of a child and other types of stress, and has a poor prognosis for recovery. She is not capable of being an appropriate parent. Dr. McNaught, who was appointed at the mother's request for an independent evaluation, basically agreed with Jesseph's evaluation, and the recommendation against returning the children.

The father is a farmer described by all witnesses as only marginally involved with child-rearing. His psychological evaluation described a dependent personality, timid and passive, who is afraid of his wife and avoids conflict with her. His prognosis for improvement is poor, and in the psychologist's opinion he cannot be a minimally adequate parent.

The family has received extensive services from the county welfare agency and public health nurse, beginning in 1970. They have received homemaker services since that time, involving weekly visits to improve a substantial problem with main-

taining a clean and orderly home. The county has alleged neglect of housekeeping duties to an extent that threatens the safety and health of the children, including burning of garbage in the basement, neglect of dishwashing, plugged toilets, and neglect of children in diapers.

In addition to the mother's in-patient treatment, the parents have received extensive counseling, both in marital communications and parenting skills. They were required to attend AA meetings but have not consistently provided verification of attendance. County involvement in the home peaked in 1984 with intensive in-home counseling to improve housekeeping and parenting skills. Despite this service, and although some progress was made, housekeeping deteriorated again to an unsanitary level.

## ISSUE

Did the trial court err in terminating parental rights?

## ANALYSIS

The trial court made exhaustive factual findings as to conditions in the home, services offered to the family, fitness of each parent and the emotional health and development of each child. The court ordered termination on the following statutory grounds:

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able; or

\* \* \* \* \* \*

(4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child; or

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination; \* \* \* \*.

Minn.Stat. § 260.221(b)(2), (4), (5) (1984).

■ Parental rights may not be terminated unless the party seeking termination presents clear and convincing evidence that a specific statutory ground for termination exists. *In re Maas*, 355 N.W.2d 480, 482 (Minn.Ct.App.1984). Only one of the statutory grounds must be found. *In re R.M.M.*, 316 N.W.2d 538, 541 (Minn.1982). Such a finding in support of termination will not be reversed unless clearly erroneous. *In re Solomon*, 291 N.W.2d 364, 367 (Minn.1980). An appellate court, however, exercises great caution in termination cases, upholding a trial court's decision to terminate parental rights only when the evidence clearly mandates such a result in accordance with statutory standards. *In re Kidd*, 261 N.W.2d 833, 835 (Minn.1978).

Appellants challenge the trial court's finding of parental unfitness. *See* Minn. Stat. § 260.221(b)(4). They point out that the court must examine conditions as they exist at, and up to, the time of the termination hearing, and not conditions leading to the finding of neglect or dependency. *In re Clausen*, 289 N.W.2d 153, 156 (Minn. 1980). They argue that the real problem at this time is the oldest son, not the mother, who they contend has been chemically free and non-abusive for the last five years. This argument ignores not only the threat to poison A.M., but the existence of unsanitary conditions in the home which threatened the children's health and welfare.

■ The mother's mental illness is not by itself grounds for termination, but the illness plainly resulted in specific detrimental conditions, directly relates to her parenting ability, and is, in the opinion of all experts, permanently detrimental. *See Welfare of P.J.K.*, 369 N.W.2d 286, 290

(Minn.1985) (mental retardation caused incapacity to learn parenting skills).

 The father's unfitness rests in his inability to protect the children from abuse at the hands of the mother and older brother, and his general inability to actively raise the children due to a dependent personality. *Welfare of C. Children,* 348 N.W.2d 94, 97 (Minn.Ct.App.1984) (wife's passive acceptance of husband's sexual improprieties towards daughters supported finding of neglect). Since the father is now separated from his wife, and the oldest son has been placed outside the home, the finding of his present unfitness rests on the psychological evaluation of him as a dependent personality and the prognosis that he would not make a minimally adequate parent.

The trial court also found that substantial services offered to the family have failed to correct the conditions of filth or the physical or sexual abuse which caused the removal of the children from the home. *See* Minn.Stat. § 260.221(b)(5).

Appellants contend that the failure of reasonable efforts was not shown because the testimony of Dennis McGaughey, the in-home service provider, indicated some progress in housekeeping and parenting, and because the foster placement plans failed to provide therapy for the mother's childhood abuse.

The social services provided in an effort to reunite the family are impressive in scope and intensity. McGaughey visited the home at least weekly, and sometimes three times a week, and did extensive counseling with the parents. Despite his efforts and those of others, the home in 1984 was filthy, the mother was again threatening physical abuse by poisoning, and the parents had failed to protect their younger children from physical and sexual abuse by the oldest son.

There is no requirement that a plan address the parent's own childhood abuse. *See Welfare of D.D.K.,* 376 N.W.2d 717, 721 (Minn.Ct.App.1985) (mother who had been sexually abused resisted counseling, although plan was not addressed specifically at that problem). Here, the mother received extensive in-patient treatment for her mental illness.

## DECISION

The trial court did not err in terminating parental rights to the seven children.

Affirmed.