*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0255, A15-0256**

In the Matter of the Welfare of the Child of:
I. M. W. and R. J. M., Parents

**Filed August 3, 2015**
**Affirmed**
**Hooten, Judge**

Hennepin County District Court
File No. 27-JV-14-5517, 27-JV-14-781

Mary F. Moriarty, Hennepin County Chief Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant I.M.W.)

Joanna Woolman, William Mitchell Child Protection Clinic, Nicole Wunderlich, Certified Student Attorney, St. Paul, Minnesota (for appellant R.J.M.)

Michael O. Freeman, Hennepin County Attorney, Kacy Wothe, Assistant County Attorney, Minneapolis, Minnesota (for respondent county)

Eric S. Rehm, Burnsville, Minnesota (for guardian ad litem)

Jeremy Prose, Linnam & Elsmere Law Firm, St. Paul, Minnesota (for foster mother D.M.)

Considered and decided by Reilly, Presiding Judge; Hooten, Judge; and Toussaint, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HOOTEN**, Judge

In these consolidated appeals, appellant father and appellant mother each challenge the termination of their parental rights, arguing that respondent county failed to make reasonable efforts to reunite the family and that the record does not support termination on any of the statutory grounds found by the district court. Appellant mother further argues that the record does not show that termination is in the child's best interests, while appellant father contends that the district court made a number of procedural errors. Because the record supports the district court's statutory termination of appellants' parental rights and its determinations that respondent county made reasonable efforts toward reunification and that termination is in the best interests of the minor child, we affirm.

## FACTS

On August 21, 2014, respondent Hennepin County (the county) petitioned for termination of the parental rights of appellant mother I.M.W. and appellant father R.J.M. regarding their minor child, B.M.W. The petition alleged that involuntary termination was in the best interests of the child and was warranted under five different statutory grounds. Appellants both entered a denial to the permanency petition and a court trial was held on November 12 and 13, 2014. The following facts were adduced at trial.

Besides B.M.W., I.M.W. has two other children. These children have a different father, B.R., who committed several acts of domestic violence against I.M.W. throughout 2004 and 2005 that triggered the involvement of child protection. In 2006, both children

2

were adjudicated as children in need of protection or services (CHIPS) based on I.M.W.'s admission that her chemical dependency issues interfered with her ability to appropriately parent the children. The children were placed with their maternal grandmother, D.M. The district court ordered I.M.W. to comply with a case plan that included chemical dependency evaluations, a parenting assessment, and domestic abuse counseling. In January 2008, I.M.W. admitted that she had not used the offered services in compliance with her case plan and agreed to transfer custody of these children to D.M.

I.M.W. gave birth to B.M.W. on May 3, 2009. R.J.M. executed a voluntary recognition of parentage soon thereafter. B.M.W. was placed with D.M. at the time of his birth because I.M.W. was serving a prison sentence for second-degree assault. The county filed a CHIPS petition on B.M.W.'s behalf on May 8, and appellants were each offered voluntary case plans. In August 2009, B.M.W. was adjudicated as a CHIPS due to I.M.W.'s incarceration, history of chemical dependency and domestic violence issues, and past involvement with child protection, and the district court ordered that he remain in out-of-home placement with D.M. Due to I.M.W.'s case plan cooperation, the district court reunified B.M.W. with I.M.W. when he was 11 months old.

In July 2010, a few months after B.M.W. reunified with I.M.W., D.M. informed the county that I.M.W. and R.J.M. were having physical altercations in front of B.M.W., which included I.M.W. brandishing a knife and throwing items at R.J.M. D.M. claimed that I.M.W. hit B.M.W. in the head with one of the thrown items. Another domestic incident occurred in September 2010, when police were dispatched to appellants' residence and were told by I.M.W. that R.J.M. had choked, punched, and bitten her in the

3

course of a dispute. At trial, R.J.M. claimed that the two had a "scuffle" requiring him to put her in a full nelson and bite her in order to get I.M.W. to drop a knife. R.J.M. petitioned for an order for protection (OFP) against I.M.W. at that time, which ultimately was not granted. I.M.W., taking B.M.W. with her, then moved out of appellants' shared apartment.

D.M. testified to other events involving appellants' care of B.M.W. D.M. testified that R.J.M. hit B.M.W. on the leg with an open hand after B.M.W. refused to cooperate when I.M.W. and R.J.M. were leaving a family birthday party at D.M's house. In 2012, I.M.W. left B.M.W. with D.M. when appellants were without housing and living in their car. In February 2012, R.J.M. pleaded guilty to violating a domestic abuse no-contact order that I.M.W. had obtained against him and was ordered to complete a domestic violence program while on probation.

On November 25, 2013, D.M. filed a petition for an OFP on behalf of B.M.W. against I.M.W. D.M. requested custody of B.M.W. because I.M.W. was, at that time, homeless and abusing drugs and alcohol, and D.M. believed that B.M.W. was subject to physical abuse and improper care when in the custody of I.M.W. D.M. testified at trial that just before she filed her OFP petition, she had witnessed I.M.W. yelling at B.M.W. in public, and later that day she took B.M.W. away from I.M.W. after finding I.M.W. in an intoxicated state at a relative's home. D.M. then gave B.M.W. a bath and noticed bruises on his back and around his eye. B.M.W. was also underweight and dirty.

In a December 2013 interview with police, B.M.W. stated that appellants were "mean" and that they both would hit him with belts or fists. He said that I.M.W. had hit

4

him in the face, causing a facial injury. B.M.W. also told the doctor who examined his injuries that I.M.W. had hit him and reiterated that he was scared of R.J.M. because R.J.M. had also hit him. The doctor noted that B.M.W. had sustained a laceration and bruising on his left temple where he claimed that I.M.W. had struck him.

When R.J.M. was interviewed by police, he claimed that I.M.W. would often slap B.M.W. in the face and had been doing so since B.M.W. was two years old. R.J.M. characterized I.M.W.'s conduct toward B.M.W. as emotional "torture" and alleged that she would break B.M.W.'s toys deliberately and otherwise act overly controlling toward B.M.W. R.J.M. denied that he physically abused the child and admitted to only one incident in which he hit B.M.W. with a belt 3–5 times on the leg as a "teaching moment." D.M. was granted an OFP against I.M.W., on behalf of B.M.W., in March 2014.

In connection with these reports, the state charged I.M.W. with felony malicious punishment of a child on March 6, 2014, and she pleaded guilty to the offense in July 2014. But, at the plea hearing, I.M.W. first claimed that B.M.W. had been bruised after falling off his bicycle. After being reminded that she was required to take responsibility in order to plead guilty, I.M.W. admitted that she had excessively punished B.M.W. by striking him in the face with her hand. In the August 2014 presentence investigation (PSI), I.M.W. claimed that she was innocent and that everyone involved were "making up lies because they are against her." She again asserted that B.M.W. was bruised after falling off his bicycle, and that he also had birthmarks that resembled bruising. The PSI concluded that "the defendant's staunch denial of responsibility, her inability to identify areas of improvement, and her belief that this case is a conspiracy" meant that I.M.W.'s

5

amenability to probation was "poor." The district court sentenced her to probation, ordered that she have no contact with B.M.W. except by court order, and instructed her to follow her child protection case plan as conditions of her probation.

On February 6, 2014, concurrent with these OFP and criminal proceedings, the county filed a CHIPS petition regarding B.M.W. At a February 11 emergency protective care hearing, the district court approved placement of B.M.W. with D.M. On April 16, 2014, the district court adjudicated B.M.W. as a CHIPS upon I.M.W.'s admission that her chemical dependency issues and past involvement with child protection negatively impacted her ability to parent B.M.W. The district court ordered appellants to comply with multifaceted case plans, which required I.M.W. to:

1. Complete a [chemical dependency] assessment and follow all recommendations;
2. Submit to random urinalyses as requested to document sobriety;
3. Complete a mental health evaluation and follow all recommendations;
4. Complete domestic violence programming and follow all recommendations;
5. Complete parenting programming and follow all recommendations;
6. Abide by all family court and criminal court orders and probation; . . .
7. Maintain safe and suitable housing[; and]
8. Follow the Order for No Contact[] dated April 10, 2014 . . . .

Similarly, the district court ordered R.J.M. to:

1. Demonstrate sobriety through urinalyses;
2. Complete [a chemical dependency] assessment and follow all recommendations if any UAs [are] positive;
3. Complete parenting assessment and follow all recommendations;

6

4. Complete mental health evaluation and follow all recommendations;
5. Complete anger management programming and follow all recommendations;
6. Abide by all court orders; and
7. Maintain[] safe and suitable housing.

After B.M.W. was adjudicated as a CHIPS, appellants began the treatment recommended by their case plans.

I.M.W. has a history of significant alcohol, cocaine, and marijuana use. She received chemical dependency treatment in 2006 and 2009 but relapsed both times after treatment. I.M.W. was dismissed from another chemical dependency treatment program in January 2014 and had several positive urinalysis tests in early 2014. But, all of the urine samples she submitted from April 13, 2014 forward were negative. I.M.W. submitted to a chemical dependency assessment and began receiving treatment at Wellcome Manor in May 2014. However, due to her lack of progress in the program, she was discharged a month later when her insurance company was unwilling to pay for the high-intensity treatment I.M.W. required.

I.M.W. then entered outpatient treatment at Avalon Midway on June 30, 2014. While I.M.W. continued to struggle with taking responsibility for her addiction issues and was assessed as having a moderate risk of relapse, she never missed a treatment session and underwent both intensive and lower-intensity sessions at Avalon, graduating from the program on November 4, 2014. At trial, a supervisor from Avalon testified that I.M.W. had "complied" and made progress, but continued to lack insight into her chemical dependency issues and remained vulnerable to impulsive behaviors.

7

R.J.M. twice tested positive for alcohol in April 2014, failed to provide two urine samples in August 2014, and had two diluted urinalysis tests in October 2014. R.J.M. submitted to a chemical dependency assessment in connection with his positive tests, which ultimately did not recommend any chemical dependency treatment for him.

Appellants both participated in mental health treatment. During her time at Wellcome Manor, I.M.W. self-reported that she had been previously diagnosed with post-traumatic stress disorder, bipolar disorder, and borderline personality disorder. I.M.W. began occasionally seeing a therapist in February 2014, but fired her after five sessions when the therapist recommended that I.M.W. receive a neuropsychological evaluation. However, I.M.W. eventually received a neuropsychological evaluation in October 2014, which indicated that I.M.W. "could have significant difficulty in day to day functioning due to cognitive impairment," and that she "appear[ed] to be incapable of truly independent living[,] though not necessarily requiring residential placement." The evaluation offered no conclusion regarding her parenting competency, but did indicate that I.M.W. "may have executive function deficits that would seriously impede her ability to benefit from psychotherapy, to understand her children['s] behavior, to change her own behavior, and to make appropriate decisions regarding the care of her children."

R.J.M. also underwent a mental health evaluation, during which he described his significant issues with depression and other mental health issues in the past, for which he was prescribed medication that he used sporadically. The evaluator diagnosed him with major depressive disorder with psychotic features. The report further provided that his cognitive functions were consistent with his peers, although he exhibited a "skewed and

8

highly subjective viewpoint" which caused him to "struggle to hold himself accountable for his actions." The evaluation recommended a parenting assessment, medication, and therapy for his anger and delusional thinking. A later psychiatric evaluation also diagnosed him with depression but did not indicate any further mental health issues. R.J.M. participated in individual therapy for these issues, but was deemed unqualified to receive dialectical behavior therapy.

Per the case plan, R.J.M. attended 22 sessions of anger management at East Side Neighborhood Services. The program's family violence coordinator testified that R.J.M. had not yet completed the program because he "ha[d] yet to take responsibility for the behaviors that involved him with [c]hild [p]rotection," and was on the verge of discharge from the program because he had recently had his third and final absence from a session. R.J.M. also received a parenting assessment, at which he claimed he did not need anger management and further asserted that the county was the cause of B.M.W.'s mental health and emotional problems.

Throughout the proceeding, R.J.M. exhibited animosity toward D.M. and the county's social worker, as well as stalking behavior regarding B.M.W. Early in the CHIPS proceeding, R.J.M. tried to talk to B.M.W. after a court hearing and scared the child, requiring intervention by security guards. Also in early 2014, R.J.M. had two scheduled supervised visits with B.M.W. Both went poorly. B.M.W. began crying upon seeing R.J.M. and did not want to enter the visitation room during either visit. After these visits, the district court suspended visitation in March 2014 and denied R.J.M.'s later request for visitation due to the district court's concerns about R.J.M.'s failed

9

urinalyses and B.M.W.'s demonstrated fear of R.J.M. Visitation for I.M.W. was similarly allowed only at the discretion of the district court.

But, R.J.M. continued to seek contact with B.M.W. after the district court's decision to disallow visitation. D.M. testified that R.J.M. arrived unannounced at B.M.W.'s school in the summer of 2014 and threatened D.M. by telling her that he would not leave without B.M.W. and that there was "nothing [she could] do about it if [she] was dead." B.M.W. saw R.J.M. at his school and was upset and scared by this occurrence. R.J.M. came unannounced to a doctor visit that B.M.W. had in 2014. R.J.M. also made threats to the county's staff and the social worker on the case.

Both parents also completed outside programming at Urban Ventures, and I.M.W. attended programs at Breaking Free and the Phyllis Wheatley Community Center. The parenting educator who worked with I.M.W. at Urban Ventures indicated that the program had taught I.M.W. the differences between "malicious punishment" and "discipline," and that I.M.W. had admitted striking her son in the face and was remorseful for having done so. At Breaking Free, I.M.W. completed a program designed to support and advocate for women who had previously been involved in prostitution. At the Phyllis Wheatley Community Center, I.M.W. admitted her abuse of B.M.W. and successfully completed the 12-week domestic violence program.

Ultimately, the county's social worker opined that in spite of appellants' participation in these services, both parents continued to lack insight as to why their actions harmed B.M.W. and consistently failed to take responsibility for the past harm they had done to the child. For I.M.W., the social worker specifically expressed concerns

about the effect I.M.W.'s mental health and cognitive impairment issues would have on her parenting. For R.J.M., the social worker indicated concern with R.J.M.'s inclination to blame the county or D.M. for his problems, as well as his recent missed and diluted urine samples. The social worker believed that additional services would not result in reunification in the foreseeable future for either parent, and that termination of appellants' parental rights would be in B.M.W.'s best interests.

In addition to the testimony regarding appellants, both D.M. and the guardian ad litem testified that, since his out-of-home placement, B.M.W. was thriving under D.M.'s care. An April 2014 assessment diagnosed B.M.W. with post-traumatic stress disorder and noted his demonstrated fear of his parents. At trial, the guardian ad litem confirmed that B.M.W. told her that he was scared of his parents and stated that such fear was "not unusual" when a child has been exposed to corporal punishment by his or her parents. D.M. testified that B.M.W. had made a good adjustment to her home since his placement in spite of these issues. She testified that many of B.M.W.'s troubling behaviors, such as his need to sleep with the light on and his food hoarding, had subsided and that B.M.W. was a happier child in general. The guardian ad litem agreed that B.M.W. had "blossomed" under D.M.'s care and that termination of appellants' parental rights would be in his best interests.

On December 29, 2014, the district court ordered the termination of appellants' parental rights. The district court first evaluated the credibility of the trial witnesses, finding appellants' testimony to be not credible due to its lack of corroboration and internal inconsistency. The district court found that the county had made reasonable

11

efforts to reunify B.M.W. with appellants, that there was clear and convincing evidence supporting termination on all five statutory grounds, and that termination was in the best interests of B.M.W. The district court issued an amended order after appellants each moved the district court for a new trial and/or amended findings. I.M.W. and R.J.M. separately appealed the district court's decision, and we consolidated their appeals.

## DECISION

Appellants argue that the record lacks clear and convincing evidence to support the termination of their parental rights. Because natural parents are presumed to be fit to care for their children, parental rights may be terminated only for "grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012). The petitioning county has the burden of overcoming this presumption and proving grounds for termination by clear and convincing evidence. *Id.* We review the district court's findings for clear error, and "review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see also In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014) ("[T]ermination of parental rights is always discretionary with the [district] court."). Although "[w]e give considerable deference to the district court's decision to terminate parental rights," we conduct a close review of the record in determining whether the evidence is clear and convincing. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). We will affirm if a statutory ground for termination is supported by clear and convincing evidence and termination of parental

12

rights is in the minor child's best interests.  *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008).

**I.**

Appellants argue that the county failed to make reasonable efforts to rehabilitate appellants and reunite them with B.M.W. "'Reasonable efforts' at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Mar. 28, 2007).  "The quality and quantity of efforts to rehabilitate and reunite the family" are indicative of the efforts' reasonableness.  *Id.*  In assessing whether reasonable efforts were made, district courts consider whether the services were: "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances."  Minn. Stat. § 260.012(h) (2014).

The district court found that the county made reasonable efforts to reunify B.M.W. with appellants through the county's provision of case management, foster care for B.M.W., chemical dependency assessment and treatment, parenting assessment and education, mental health evaluations, therapy, urinalyses, housing services, and domestic abuse and anger management treatment.  The district court noted that the county provided these services to help appellants develop the skills necessary to safely parent B.M.W. in light of his emotional and mental health issues stemming from appellants' physical abuse. Appellants raise a number of arguments as to why these services were inadequate.

13

Appellants both allege that the termination decision was reached too quickly in this case, and that appellants therefore lacked an opportunity to continue using the services offered by the county and potentially obtain visitation with B.M.W. Generally, district courts are required to "commence permanent placement determination proceedings" no later than 12 months after the child is placed out of the home. Minn. R. Juv. Prot. P. 42.01, subd. 5(b). Time spent by the minor child in foster care "within the previous five (5) years" counts toward the 12-month limitation. Minn. R. Juv. Prot. P. 42.01, subd. 4(b). This time period can be extended by as much as six months if there are "compelling reasons" and an extension is in the best interests of the child. *Id.* A trial on the permanency petition must take place within 60 days of the filing of the petition for termination of parental rights. Minn. R. Juv. Prot. P. 39.02, subd. 1(b).

B.M.W. spent 11 months in out-of-home placement with D.M. when he was born, from May 2009 to April 2010. By the time trial was held in November 2014, B.M.W., who had been placed with D.M. in February, had spent more than 20 months in foster care. Given the timelines set forth in the juvenile protection rules, further delay of the permanency decision was not an option available to the district court or the parties. In addressing a timeliness issue under these rules, our supreme court has said that "[e]ach delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home." *In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn. 2003). On this record, further delay in B.M.W.'s permanent placement would not only have contravened the timelines set forth in the rules, but would also have unreasonably placed the desires of appellants over the interest of B.M.W. in having permanent, stable care and

14

housing.  *See* Minn. Stat. § 260.012(a) (2014) ("[T]he child's best interests, health, and safety must be of paramount concern.").

Beyond the permanency timelines, R.J.M. asserts more generally that the county's efforts at reunification were not reasonable because the county failed to give R.J.M. adequate time to correct the conditions that led to the out-of-home placement.  This argument is unavailing.  R.J.M. cites cases in which the agencies gave parents over 10 *years* of time, and contrasts his involvement in the case with I.M.W.'s long history of contact with the county due to her previous children.  *See In re Welfare of A.H.*, 402 N.W.2d 598, 599–600, 604 (Minn. App. 1987) (affirming district court's finding that reasonable services had been provided when parent had received county services for nearly ten years); *In re Welfare of B.M.*, 383 N.W.2d 704, 705, 708 (Minn. App. 1986) (concluding that reasonable services had been provided when county had been involved for 14 years), *review denied* (Minn. May 22, 1986).  However, in relation to B.M.W., R.J.M. could not have had a longer period of involvement with the county—the county offered a voluntary case plan in the CHIPS action shortly after B.M.W.'s birth.  The caselaw cited by R.J.M. does not support the proposition that a parent is entitled to services for a period of ten or more years; rather, these cases merely noted that the lengthy provision of agency services supported district court findings regarding the reasonableness of such services.  *A.H.*, 402 N.W.2d at 604; *B.M.*, 383 N.W.2d at 708. Furthermore, such services must be "consistent and timely," Minn. Stat. § 260.012(h)(5), and can only be provided within the bounds of the permanency timelines outlined above.

15

Appellants also argue that the county failed to provide reasonable services because they each were denied visitation with B.M.W. after he entered foster care with D.M. The district court can deny visitation to a parent if it finds that visitation would endanger the child's wellbeing or is not in the child's best interests. Minn. Stat. § 260C.201, subd. 5 (2014). Appellants raise separate arguments asserting why the lack of visitation rendered the county's services unreasonable in this case.

I.M.W. infers that the social worker, and the county by extension, believed additional services were futile. Her inference is apparently based on her lack of visitation and the county's failure to visit the sober housing I.M.W. obtained a few months before trial. She asserts that visitation was "utterly dependent" on the county's recommendation and that the social worker "abusive[ly]" exercised her power to prevent I.M.W. from having visitation. However, this argument mischaracterizes the record and overstates the abilities of the county in this case. The district court's CHIPS order indicates that visitation was to be allowed at the discretion of the *district court*, not the county. Both the OFP that D.M. obtained on B.M.W.'s behalf against I.M.W. and the conditions of I.M.W.'s probation directed that the district court in this case needed to approve visitation in order for I.M.W. to contact B.M.W. At no point in this proceeding did the district court indicate that I.M.W. could obtain or be denied visitation solely based on the recommendation of the county or the social worker.

We can distinguish the case relied on by I.M.W., *In re Welfare of M.A.*, which involved the *county's* choice to suspend a parent's visitation rights. *See* 408 N.W.2d 227, 230 & n.1 (Minn. App. 1987), *review denied* (Minn. Sept. 18, 1987). Here, the

concurrent proceedings against I.M.W. and the district court's order precluded the county from offering I.M.W. visitation with B.M.W. as a service. If I.M.W. desired visitation, she needed to request visitation and show the *district court* that visitation would not endanger B.M.W.'s physical or emotional wellbeing and would be in his best interests. *See* Minn. Stat. § 260C.201, subd. 5. On appeal, she does not indicate whether she made this request, nor does she assert that she would have been successful in doing so.

R.J.M. also argues that the county did not make reasonable efforts because R.J.M. was not allowed, for most of the proceeding, to visit B.M.W. The district court suspended R.J.M.'s right to visitation in a March 2014 order which indicated that the guardian ad litem requested that the district court suspend all visitation while B.M.W. attended therapy. R.J.M. later requested visitation, which was denied by the district court because R.J.M. was not following his case plan; R.J.M. had recently provided positive urinalysis tests and B.M.W. was "reportedly terrified when [R.J.M.] appeared without notice at his school." The record shows that B.M.W. exhibited fear of R.J.M. on multiple occasions, that prior supervised visits went poorly, and that appellant had recently tested positive for alcohol use at the time he requested visitation. This was sufficient evidence for the district court to determine that visitation was not in B.M.W.'s best interests.

I.M.W. further argues that the social worker considered the provision of services to be futile and thereby failed to stay engaged in I.M.W.'s case by contacting service providers and assessing the new housing obtained by I.M.W. These arguments are unpersuasive. The social worker testified that she had received the neuropsychological evaluation the week before trial and could not contact the evaluator because he was on

17

vacation, and that she had contacted Urban Ventures and never received a return communication. The social worker was also in contact with the domestic violence coordinator at Phyllis Wheatley and received reports from I.M.W.'s other service providers. The social worker acknowledged that she had not reached out to service providers at Breaking Free, but explained that she chose not to contact them because I.M.W.'s treatment there "wasn't a part of the risk or issues that led to this . . . case opening." Moreover, the social worker testified that she had not yet inspected I.M.W.'s new housing because that was something she would do only before a child had a home visit. Because I.M.W. did not have the right to visitation with B.M.W., there was no need for the social worker to inspect her new housing.

I.M.W. also argues that the neuropsychological evaluation "clearly invited more work with [her]" regarding her cognitive functioning. But, I.M.W. does not clarify what, if any, additional services the county should have provided in light of this report. The social worker received this report just before trial and testified that if the neuropsychologist "would have made recommendations, [the social worker] certainly would have followed up with those." And, more importantly, this report appears to be the only indication in the case that I.M.W.'s cognitive functioning might impact her parenting of B.M.W., as the focus throughout these proceedings was on I.M.W.'s physical abuse and chemical dependency problems. The lack of additional services here does not impact the reasonableness of the services provided to I.M.W.

R.J.M. also contends that the district court's finding that the county's efforts were reasonable efforts was clearly erroneous because the services were wrongly focused on

18

only evaluating R.J.M.'s deficiencies as a parent. In support of his argument, he cites two cases in which the county's provision of services aimed at evaluating a parent's deficits were unreasonable when the county failed to also provide services designed to treat those issues. *See T.R.*, 750 N.W.2d at 665 ("[S]imply testing for substance use, without more, is not realistic under the circumstances to rehabilitate a parent who . . . suffers from chemical dependency issues."); *In re Welfare of M.D.O.*, 462 N.W.2d 370, 377 (Minn. 1990) (noting "the county's admitted failure to provide services, counseling, or assistance to aid [the parent] in coming to grips with her conduct"). Unlike the factual situation in *T.R.* and *M.D.O.*, R.J.M. was not ordered to merely submit to evaluations; rather, he was provided anger management and parenting skills classes meant to remedy his past pattern of mistreatment of B.M.W. The record does not support his claim here.

Next, R.J.M. argues that, by placing B.M.W. with D.M. before the permanency petition was filed, the county "guaranteed" that reasonable efforts at reunification would fail. R.J.M. claims that he and I.M.W. "clearly expressed" their desire not to have the child placed with D.M. and that this placement violated Minn. Stat. § 260C.193, subd. 3(e) (2014). This statute requires the district court to honor a parent's "explicit[] request" that a relative not be considered if such request is consistent with the child's best interests. Minn. Stat. § 260C.193, subd. 3(e). However, R.J.M. does not show where in the record he or I.M.W. raised their objection to B.M.W.'s placement with D.M. before the district court, as required by section 260C.193, subd. 3(e). Not only does this fail to trigger the district court's requirement to then honor such a request, *id.*, it means that the issue is not properly before us on appeal. *See In re Welfare of M.H.*, 595 N.W.2d 223,

19

229 (Minn. App. 1999). More generally, R.J.M. does not show how the district court did *not* act in B.M.W.'s best interests by placing the child with a close relative that already had custody over two of B.M.W.'s siblings. *See* Minn. Stat. § 260C.212, subd. 2 (2014) (stating that placement decisions are based on the best interests of the child through consideration of a number of factors).

The county's provision of services here also negates R.J.M.'s argument that the district court failed to make a finding that the county properly assessed whether or not R.J.M. was a viable placement option for B.M.W. The district court was required to make findings regarding the county's identification, assessment, and offer of services to the non-custodial parent under Minn. Stat. § 260C.201, subd. 2(a)(4)(ii) (2014). In its CHIPS order, the district court found that the county had made reasonable efforts to assess R.J.M.'s ability to care for B.M.W. and offered him a case plan intended to enable him to parent B.M.W. These findings satisfied the requirements of the statute.

We conclude that, on this record, the district court's findings regarding the county's provision of reasonable efforts to rehabilitate appellants and reunite them with B.M.W. are not clearly erroneous.

**II.**

The district court found clear and convincing evidence in support of five statutory grounds for terminating appellants' parental rights. *See* Minn. Stat. § 260C.301, subd. (1)(b)(2), (4), (5), (6), (8) (2014). Appellants assert that none of these five grounds were sufficiently supported by clear and convincing evidence. We will affirm the district court's termination decision "if at least one statutory ground alleged in the petition is

20

supported by clear and convincing evidence and termination of parental rights is in the child's best interests." *T.R.*, 750 N.W.2d at 661. We need only address one of the five grounds found by the district court in this case.

Parental rights may be terminated if, "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). Reasonable efforts are presumed to have failed if it is shown that:

> (i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. In the case of a child under age eight at the time the [CHIPS] petition was filed . . . the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the out-of-home placement plan;
> (ii) the court has approved the out-of-home placement plan required under section 260C.212 and filed with the court under section 260C.178;
> (iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to a child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and
> (iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

*Id.* Here, the district court found that all four of these factors were met to trigger the statutory presumption that reasonable efforts had failed. Appellants challenge factors (i), (iii), and (iv). We analyze only factors (i) and (iii), as we have addressed and rejected appellants' challenges to the reasonable efforts provided by the county in Part I, *supra*.

21

*Factor (i): Out-of-home placement*

The district court found that this factor was met because B.M.W., who was five years old at the time of the hearing, had resided with D.M. for more than six months, and appellants had not maintained regular contact with B.M.W. nor fully complied with their case plans. Appellants argue that the first factor was not met because their failure to maintain regular contact was out of their control and they were in sufficient compliance with the case plan to satisfy the statute. This argument is unavailing because, as explained in Part I, I.M.W. was prohibited from contacting B.M.W. due to the physical abuse that led to her criminal conviction and the OFP obtained by D.M. She admitted at trial that she had no contact with B.M.W. R.J.M. was unable to visit B.M.W. due to the district court's decision that visitation by R.J.M. would not be in B.M.W.'s best interests. Because the out-of-home placement exception requires regular contact *and* case plan compliance, appellants' failure to maintain regular contact with B.M.W. is sufficient to support the district court's finding that this factor was met.

*Factor (iii): Conditions have not been corrected*

Under this factor, the district court found that although appellants had "completed many of the requirements of their case plans, they are still currently unable to care for [B.M.W.]" The district court found that both appellants had failed to understand and internalize the behavioral changes necessary to eliminate the risk that one or both appellants would continue the prior behavior which put B.M.W. in physical and emotional danger. Appellants separately argue that, due to their compliance with their case plans, the district court erred by determining that they had failed to correct the

22

conditions that led to B.M.W.'s out-of-home placement. However, "[a] parent's substantial compliance with a case plan may not be enough to avoid termination of parental rights when the record contains clear and convincing evidence supporting termination." *J.K.T.*, 814 N.W.2d at 89. The issue is not whether appellants formally complied with the case plan, but whether appellants are "presently able to assume the responsibilities of caring for" B.M.W. *Id.*

I.M.W. challenges several of the core findings of fact that underlie this determination. In finding that I.M.W. had failed to internalize what she had learned in treatment, the district court relied upon the fact that, throughout the proceeding, I.M.W. inconsistently took responsibility for her physical abuse of B.M.W. Accordingly, the district court noted that it was "not convinced that [I.M.W.] truly understands and acknowledges [the] past abuse." I.M.W. asserts that this conclusion lacks record support, pointing to several points in the record where I.M.W. did admit her abuse.

This challenge is unavailing. Given the findings of physical abuse that I.M.W. does not challenge on appeal, the district court was tasked with determining whether this past mistreatment of B.M.W. by I.M.W. would continue if I.M.W. retained her parental rights. The record as a whole shows that, while I.M.W. completed much of her recommended programming and sometimes admitted to the abuse, I.M.W. often minimized her responsibility or even denied the abuse, and she appeared to lack understanding of the effects that her abuse had on B.M.W. First, her admissions to the Urban Ventures parenting educator lacked detail as to the frequency or nature of her physical abuse of B.M.W. At the plea hearing for her felony malicious punishment of a

23

child offense, I.M.W. initially claimed that B.M.W. received facial bruising after falling off his bike and only admitted to hitting B.M.W. after being reminded by the district court and her attorney that she needed to acknowledge guilt in order to plead guilty. Then, shortly after the plea hearing, I.M.W. completely denied the abuse allegations, as related in the PSI. Moreover, the district court found that I.M.W.'s trial testimony lacked credibility. *See In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996) (noting that termination decisions are given considerable deference because the district court is in a superior position to assess the credibility of witnesses). At trial, I.M.W. admitted to abusing B.M.W. and using improper methods of physical discipline, but then later testified that "[B.M.W.] don't get whooped, [B.M.W.] don't get hit" by her or R.J.M. She also denied her past denials of her physical abuse of B.M.W. Given the evidence in the record, the district court's finding that I.M.W. did not truly take responsibility for her past abuse is supported by clear and convincing evidence.

I.M.W. also argues that the district court's findings regarding her chemical dependency issues ignore the evidence in the record showing her sobriety, progress in treatment, and the fact that chemical dependency treatment is an ongoing process for those who struggle with addiction issues. This argument is fairly persuasive, given the fact that I.M.W. demonstrated seven months of sobriety before trial and successfully completed her later chemical dependency treatment programs. However, the district court's finding that, as demonstrated by her prior history, there was a significant chance that I.M.W. would relapse, has substantial support in the record. I.M.W. had "a consistent pattern of chemical dependency" and had failed to maintain her sobriety after

24

attending treatment programs in 2006, 2009, and late 2013. I.M.W. entered treatment at Wellcome Manor in May 2014 but was discharged in June 2014 due to her lack of progress. Wellcome Manor staff characterized I.M.W. as one of their most difficult clients, and treatment notes indicate that I.M.W. was still at a high risk for relapse at that time. Even while I.M.W. completed treatment at Avalon Midway, her treatment plan review indicated that she had "minimal healthy coping skills" and "struggle[d] with anger and resentments from the past and present." At trial, I.M.W.'s Avalon supervisor acknowledged that I.M.W. continued to lack comprehension as to the seriousness of her addiction and remained at high risk for relapse if she lost custody of her children, saying that I.M.W. "still [had] lots of work to do" to remain sober. Overall, given our deference to the findings of the district court, there was clear and convincing evidence supporting the district court's finding that, despite I.M.W.'s treatment progress, she still faced a significant risk of relapse that prevented her from adequately parenting B.M.W.

Finally, in finding that the county's reasonable efforts had failed to correct the conditions leading to B.M.W.'s out-of-home placement, the district court relied on the "numerous service providers" who had "indicated that [I.M.W.] may be cognitively unable or unmotivated to gain insight and understanding into her own problems and how to rectify them," as well as I.M.W.'s neuropsychological evaluation. I.M.W. argues that cognitive impairment alone is insufficient to justify termination. But, I.M.W.'s argument misconstrues the district court's reasoning here. The district court did not tie I.M.W.'s inability to parent directly to her cognitive issues; rather, it stressed that I.M.W.'s failure to benefit from the services provided to her by the county may have stemmed, in part,

25

from I.M.W.'s cognitive ability. The district court did not err in finding that I.M.W.'s cognitive impairments partially contributed to the inability of the county's reasonable efforts to correct the conditions that led to B.M.W.'s out-of-home placement.

R.J.M. argues that the district court's finding regarding his failure to acknowledge the past abuse of B.M.W. and internalize proper parenting techniques is clearly erroneous, citing several points in the record that show R.J.M.'s treatment progress and positive character. But, as noted by the district court, its finding was supported by much evidence in the record showing R.J.M.'s denials of responsibility for both his and I.M.W.'s physical and emotional abuse of B.M.W. We conclude that this finding is supported by clear and convincing evidence.

## III.

I.M.W. claims that the district court erred by determining that termination of her parental rights was in the best interests of B.M.W.[1] District courts are required to give "paramount consideration" to the best interests of the child in terminating parental rights. Minn. Stat. § 260C.301, subd. 7 (2014). A district court does this by weighing three primary factors: (1) the child's interest in maintaining the parent-child relationship, (2) the parent's interest in maintaining that relationship, and (3) any competing interest of the child. *In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn.

---

[1] On appeal, R.J.M. does not challenge the district court's decision that termination of his parental rights was in the best interests of B.M.W.

App. 2011) (quotation omitted), *review denied* (Minn. Jan. 6, 2012). We review the district court's best-interests decision for an abuse of discretion. *Id.*; *see also In re Child of Evenson*, 729 N.W.2d 632, 635 (Minn. App. 2007) ("[T]he law leaves scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations.") (quotation omitted), *review denied* (Minn. June 19, 2007).

Citing the testimony of the guardian ad litem in favor of termination, the district court determined that termination of parental rights was in B.M.W.'s best interests because B.M.W.'s "interest in a safe and stable home is of utmost importance under these circumstances" and outweighed the interest of appellants based on their failure to adequately remedy their parenting inadequacies after receiving services. Our review of the record indicates that the district court's best-interests determination was not erroneous, especially in light of the psychological and emotional trauma sustained by B.M.W. while in the care of appellants and the demonstrated improvement in his emotional stability and wellbeing while in D.M.'s care.

## IV.

R.J.M. also raises a number of additional procedural arguments.

### *Permanency Progress Review Order*

After it held an August 25, 2014 permanency hearing regarding B.M.W., the district court ordered the continued out-of-home placement of B.M.W. and made corresponding findings of fact regarding this decision by checking boxes on a form document. These findings in the form of checked boxes included whether reasonable

efforts to reunify B.M.W. with appellants had been made by the county, whether the services provided were reasonable, and what the county's plan for permanency was.

When a child is in out-of-home placement, the district court is required to conduct a permanency progress review within six months of that placement to review, among other things, the parent's progress on the case plan and the agency's reasonable efforts toward reunification. Minn. Stat. § 260C.204(a)(1)–(2) (2014). Further, in any termination proceeding, the district court is required to make "specific findings" regarding reasonable efforts, "including individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." Minn. Stat. § 260C.301, subd. 8(1) (2014).

R.J.M. argues that the district court's use of a form document here meant that it failed to make adequate findings after this permanency review hearing regarding the provision of services to R.J.M. But, R.J.M. fails to provide any authority indicating that a form order, with boxes for the district court to fill out in order to indicate its relevant findings, fails to satisfy the requirement of "specific findings" under section 260C.301, subdivision 8. "An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." *State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn. App. 1997) (quotation omitted). Moreover, it does not appear that R.J.M. raised this objection before the district court. *See M.H.*, 595 N.W.2d at 229. And, most importantly, R.J.M. does not assert what prejudice resulted from this use of a form order by the district court, or what remedy he desires as a

result. We do not reverse for harmless error. *See In re Welfare of Children of D.F.*, 752 N.W.2d 88, 98 (Minn. App. 2008). We conclude that R.J.M.'s argument is without merit.

### *Procedural Due Process*

R.J.M. asserts that he was denied procedural due process, first arguing that, in the CHIPS proceeding, he was not timely assigned a public defender and was not properly added as a party. However, the district court's CHIPS adjudication was not timely appealed by R.J.M. as part of this appeal, and we accordingly lack jurisdiction to review any issues relating to the CHIPS action. *See* Minn. R. Juv. Prot. P. 47.02, subds. 1–2 (providing that an appeal from a CHIPS adjudication must be taken within 20 days of the order's filing); *see also J.R., Jr.*, 655 N.W.2d at 6 (holding that this rule is jurisdictional). R.J.M. also contends that he received untimely service of the petition to terminate his parental rights. Our review of the record indicates that R.J.M. did not raise this claim before the district court and has therefore forfeited it. *See M.H.*, 595 N.W.2d at 229. Moreover, he voluntarily appeared at the admit/deny hearing on the petition and has therefore waived any challenge to the service of the petition. *See* Minn. R. Juv. Prot. P. 32.02, subd. 6 ("Service is waived by voluntary appearance in court . . . .").

### *Fifth Amendment Privilege*

R.J.M. also raises a general argument that terminating his parental rights on the basis that he failed to admit to physical abuse of B.M.W. violates his Fifth Amendment privilege against self-incrimination. Regardless of this argument's merits, R.J.M. failed to raise this challenge at any point in the termination proceedings before the district court.

Again, issues not raised before the district court are not properly before this court on appeal. *M.H.*, 595 N.W.2d at 229.

Even if we did reach the merits of this claim, the district court's focus on R.J.M.'s admissions of guilt did not violate his Fifth Amendment rights. In *In re Welfare of J.W.*, the supreme court explained that a district court's termination of parental rights based on a parent's noncompliance with a court order *requiring* the parent to incriminate him or herself would be a Fifth Amendment violation. 415 N.W.2d 879, 883 (Minn. 1987). But, that decision further explained that the ineffectiveness of therapy due to a party's reticence in disclosing past wrongs, which may correspondingly reduce the party's ability to show rehabilitation and avoid the termination of parental rights, is *not* a violation of the Fifth Amendment. *See id.* at 883–84. This latter situation is indistinguishable from the case before us. Here, the district court did not require I.M.W. or R.J.M. to admit to past abuse, but rather indicated how their lack of admissions showed the ineffectiveness of treatment aimed at correcting their parenting deficiencies. Accordingly, we reject R.J.M.'s Fifth Amendment challenge.

Because clear and convincing evidence supports the district court's determination that the county provided reasonable efforts toward reunification, that appellants failed to correct the conditions that led to B.M.W.'s out-of-home placement, and that termination of parental rights was in the best interests of B.M.W., we affirm the district court's decision.

**Affirmed.**